**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-60360

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

VERSUS

PNEU ELECTRIC, INC./NAN YA PLASTICS CORP.,

Respondents.

Application for Enforcement of an Order
of the National Labor Relations Board

October 10, 2002

Before JONES, WIENER, and PARKER, Circuit Judges

ROBERT M. PARKER, Circuit Judge:

The National Labor Relations Board ("NLRB" or "the Board"), in seeking enforcement of its order against Respondents Pneu-Electric, Inc. ("Pneu-Elect") and Nan Ya Plastics Corp. ("Nan Ya"), raises three issues before us. First, whether substantial evidence supports the Board's finding that Pneu-Elect and Nan Ya violated Section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 151, *et seq.*, by numerous coercive anti-union acts and

1

statements, including interrogation, threats, and imposition of invalid no-solicitation rules. Second, whether substantial evidence supports the Board's finding that Pneu-Elect and Nan Ya violated Section 8(a)(3) and (1) of the Act by discharging or causing the discharge of Clifford Zylks and Andras Aycock because of their union activities. Third, whether substantial evidence supports the Board's finding that Pneu-Elect violated Section 8(a)(3) and (1) of the Act by discriminatorily refusing to consider known union supporters Russell, Longupee, and Goetzman for employment. We grant the NLRB's petition in part, except as to the potential award of back pay associated with the third issue, and vacate and remand its Order in part.

## I.  BACKGROUND.

Respondent Nan Ya operates a plastics plant in Batchelor, Louisiana. In 1995, it hired respondent Pneu-Elect, an electrical contracting company in Lafayette, Louisiana. Pneu-Elect performed at the Nan Ya site via five contracts from spring to December 1996, in which time it doubled its workforce to over 100 on that site. Neither company recognized union representation of their employees.

On June 14, 1996, Pneu-Elect's Field Manager Freddie Zeringue interviewed Andras Aycock and Clifford Zylks and directed each to report for work the following Monday at the Nan Ya site.

They did so on June 17. As they walked into the job site, Pneu-Elect Foreman Mark Miller recognized Zylks as a union

2

supporter and commented to a Pneu-Elect employee, "Here comes union trash. They're here to start trouble." After filling out their W-4 forms, Aycock and Zylks informed Zeringue that they were members of the International Brotherhood of Electrical Workers, Local Union No. 995, AFL-CIO ("the Union" or "IBEW") and that they intended to organize the Pneu-Elect employees. They put on IBEW buttons. After they left Pneu-Elect's trailer, Miller entered and asked Zeringue if he had hired them. Zeringue said that he had. Miller replied that they were "union guys," that he did not want them on his crew, and that he contemplated assigning them to "dirt work" in an isolated location. The conversation occurred before Pneu-Elect employee Simon Lopez, as did most of the conversations reported herein. The two were assigned to work on a transformer, under Miller's supervision, isolated from other employees.

Miller later asked Zeringue, "What's happening with the union guys?" Zeringue said that he had spoken with the Nan Ya Safety Manager, who would "run off" an otherwise-unidentified man and that Nan Ya did not want a union on the site.

That same day, a 10-foot piece of conduit fell from above, landing near Zylks and Aycock. Zeringue told them that it had probably been dropped by the "elevator men" who did not like the Union. He also told the two to take their Union buttons off. He later told Miller, Lopez, and others that he had talked to Nan Ya officials who said not to do or say anything, but that they would "figure something out."

While commuting together that evening, Miller told Lopez that he had "started to wait 30 minutes and throw another piece of conduit at them." He also said that he would not allow Zylks and Aycock to commute in the company van and that he would defecate in their lunch boxes, as he had done at other job sites.

On June 18, Zylks introduced himself to Pneu-Elect's owner, president, and CEO, Lester Colomb, and identified himself as a union organizer with a Union letter confirming that he and Aycock were acting in that capacity. Also that morning, Pneu-Elect Foreman Tim Benoit asked Miller if he could "find anybody on [your] crew [we] could get rid of . . . before [we] get rid of the union guys," so that firing Zylks and Aycock "wouldn't look so bad." Miller replied that it would not be a problem.

On June 19, in response to Pneu-Elect employee Walter Porche's concern of being laid off, Zeringue said, "I'm not going to lay nobody off . . . The first ones to be gone will be those union guys . . . Don't worry about nothing . . . We got a lot of work that needs to be done." The same morning, Zylks and Aycock used the phone in the company's trailer, in Zeringue's presence, to contact a Union representative for OSHA's phone number to report the dropped conduit and other safety issues. Zeringue told them to return to work and that Nan Ya's Safety Manager would find them. Nan Ya Safety Manager Paul Bergeron later introduced himself to Zylks and Aycock and told them that, if they were organizing on the job site, he would have to ask them to leave. He said that he

4

would not allow any organizing activity to occur "on this site." The two replied that they were Pneu-Elect employees and entitled to organize on the site and would continue to do so. Bergeron then told them that they had to leave immediately. Zylks and Aycock asked if he was firing them and Bergeron said that he was.

The two told Zeringue that Bergeron had fired them. Zeringue asked them to cease their organizing activities. He said, "You can't [organize] on site," and accused the two of disrupting work. They replied that they had been working and not disrupting anyone. Bergeron then joined in, repeating that he would not allow any organizing on the site. Zeringue again claimed that they had stopped others from working. Bergeron then said, "[I]t doesn't matter, done did and over with," and again ordered Zylks and Aycock to leave. They asked if Zeringue agreed they were being fired; he stated that he could not override Bergeron's order and accused them again of interrupting work, which they again denied.

Colomb later called Zylks at home and said that he and Aycock were not fired and that Nan Ya could ask them to leave the site, but could not fire them. He also said he was continuing to pay the two, at least until the matter was straightened out. Zylks said that they wanted to return to work. Colomb thought he could put them back to work, but because he was unsure if they could return to Nan Ya immediately, they arranged to meet off-site the next morning, June 20.

At the meeting, Zylks told Colomb that Bergeron had fired them

for organizing on-site. Colomb asked them, "if I can get y'all back in the plant . . . will y'all agree not to organize during work time?" Zylks replied that he would organize during working hours without stopping anyone from working. Colomb indicated that he had "documented cases that during work time y'all did go talk to people about organizing." Zylks said, "As long as I'm working I'm going to talk. I'm not stopping anybody else from working. If I go over there to pick up some pipe or go get some wire or whatever, and the guys are in there terminating and I'm cutting wire, I'm working . . . I'm not stopping nobody from working." Both refused to restrict themselves to breaks and lunches. Pneu-Elect employees at the Nan Ya site had previously been allowed to talk about anything on the job, not interfering with work.

The three disagreed whether Zylks and Aycock could be prohibited from organizing if it did not interfere with work, whether Bergeron's prohibition applied to organizing on "work time" or "on the site," and whether Bergeron had told them they were fired. Colomb again said he would talk to Nan Ya about returning them to the site.

On June 21, Colomb told them that he had spoken to Nan Ya and that he could not return them to Nan Ya as long as they refused to stop organizing during work time. Zylks said that they would continue to organize; Colomb said there was nothing he could do. That was the last contact between Zylks and Aycock and Pneu-Elect.

Also on June 21, Zeringue asked Pneu-Elect employee Johnny

6

Byrd, of whose union affiliation Zeringue was unaware, if employee George Hughes was a "union man." Byrd said he did not know.

On June 24, journeyman electrician Russell Anderson called Zeringue to inquire about hiring. He identified himself as a journeyman with an OSHA card. Zeringue said, "I pretty much need people right now . . . If you're ready to go to work, I need people bad, got a lot working right now until the end of this week, for sure this weekend." Anderson said he would apply the next day.

On June 25, three individuals wearing Union organizer buttons appeared at the Nan Ya gate. Kendrick Russell, Donald Longupee, and Roland Goetzman wanted to apply for work with Pneu-Elect. Russell was the Union's business manager and organizer; the others were electricians on its out-of-work list. Russell introduced himself to Zeringue as the Union's business manager and told him that all three wanted to apply. Zeringue told them, "I'm kinda caught up at the moment but I may be hiring . . . we're fixing to cut back some guys here" when the power station was energized. He said that was where Zylks and Aycock had been working and added, "Fixing to cut back today for sure, tomorrow once we energize it."

Colomb then went to the gate and told the three, "We're laying off, we don't have any positions or nothing right here now . . . We laid off some people yesterday and we are continuing laying off all the way through Thursday." He said he had no applications to hand out but that they could go to the Lafayette office where they could apply. He also said that they had completed one contract with Nan

7

Ya and would finish the rest that week.

Colomb subsequently told Zeringue and Miller, in front of Lopez, that he told the "union guys" at the gate that Pneu-Elect was not hiring and was laying-off. He said that Miller should tell them the same. Miller suggested offering them jobs at $6.50 per hour and Zeringue suggested giving them "a thorough ass-whipping."

Later that day, Russell Anderson appeared to apply for a job with Pneu-Elect. He did not identify himself as a Union member and was given a job application by a Pneu-Elect employee.

Based on these circumstances, the Union filed unfair labor practice charges and the Board's General Counsel issued a complaint alleging that Pneu-Elect and Nan Ya violated § 8(a)(1) and (3) of the Act. After a hearing, an Administrative Law Judge ("ALJ") issued a recommended decision and order sustaining several of the complaint's allegations. The General Counsel, Pneu-Elect, and Nan Ya each filed with the Board exceptions to the ALJ's decision.

On September 29, 2000, the Board agreed with the ALJ that Pneu-Elect violated § 8(a)(1) of the Act by threatening employees with discharge, loss of benefits or privileges, isolation from coworkers and assignment of more onerous work, and interrogating employees about the union activities of other employees, all to discourage them from engaging in union activities. Further, that Pneu-Elect violated § 8(a)(3) and (1) of the Act by discharging Zylks and Aycock because of their union activities, and by denying union-affiliated applicants consideration for employment because of

8

their union membership. Additionally, that Nan Ya violated § 8(a)(1) of the Act by telling Pneu-Elect employees that they could not engage in union activities on its premises and violated § 8(a)(3) and (1) of the Act by discharging or causing the discharge of Zylks and Aycock because of their union activities.

The Board's order directs Pneu-Elect and Nan Ya to cease and desist from engaging in the unfair labor practices found and from interfering with, restraining, or coercing employees in the exercise of their rights protected by § 7 of the Act in any like or related manner. Affirmatively, the Board's order requires Pneu-Elect to offer reinstatement to Zylks and Aycock and, jointly and severally with Nan Ya, to make them whole for losses suffered as a result of the discrimination against them; to consider applicant Russell, Longupee, and Goetzman for future job openings in a non-discriminatory manner; and to post an appropriate remedial notice. The Board's order also requires Pneu-Elect to make Russell, Longupee, and Goetzman "whole" for lost back pay, if it is shown in a future compliance proceeding that Pneu-Elect would have hired them but for its discriminatory refusal-to-consider on June 25, 1996. Further, the order affirmatively requires Nan Ya to notify Zylks and Aycock that it has no objection to their working for Pneu-Elect on Nan Ya projects, and to post an appropriate remedial notice.

The Board seeks enforcement of these orders here.

## II.  STANDARD OF REVIEW.

The Act provides that the Board's findings of fact shall be conclusive, "if supported by substantial evidence on the record considered as a whole."  *See* 29 U.S.C. § 160(e); *Mississippi Power Co. v. NLRB*, No. 00-60794, 2002 U.S. App. LEXIS 4142, at *15 (5th Cir. Mar. 14, 2002)(citing *NLRB v. Pinkston-Hollar Constr. Servs., Inc.*, 954 F.2d 306, 309 (5th Cir. 1992)).  Substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion.  *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001).

## III.  ANALYSIS.

## A.  Violation of § 8(a)(1) by coercive anti-union acts and statements.

Section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right "to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection."  Section 8(a)(1)[1] implements § 7 by making it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the free exercise of their § 7 rights.  *NLRB v. Brookwood Furniture*, 701 F.2d 452, 459 (5th

---

[1]  (a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer--
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title[.]
29 U.S.C. § 158(a)(1).

10

Cir. 1983). "The test for determining whether an employer has violated § 8(a)(1) is whether the employer's questions, threats, or statements tend to be coercive, not whether the employees are in fact coerced." *Id.* (quoting *TRW - United Greenfield Division v. NLRB*, 637 F.2d 410, 415 (5th Cir. 1981)). The coercive tendencies of an employer's conduct must be assessed within the totality of circumstances surrounding the occurrence at issue. *Id.; Selkirk Metalbestos, North America, Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997)(citing *Brookwood Furniture*). An unlawful threat is established if, under the totality of the circumstances, an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports the union.

An employer may not issue a blanket prohibition on solicitation by employees at the work site, without special circumstances. *Valmont Indus., Inc., v. NLRB*, 244 F.3d 454, 469 (5th Cir. 2001)("[i]t is not within the province of an employer to promulgate and enforce a rule prohibiting [] solicitation by an employee outside of working hours, although on company property")(citing *Cooper Tire & Rubber v. NLRB*, 957 F.2d 1245, 1249 (5th Cir. 1992)). An employer must permit solicitation during meals, breaks, and other nonworking time, even if the employee remains "clocked in" during such times. 957 F.2d at 1249 n.7. Even during "paid working hours," an employer must allow solicitation en route to and from the timeclock, in the break room,

11

and in the rest rooms. *Valmont Indus.*, 244 F.3d at 469 (citing 957 F.2d at 1248-50).

Although it is "well-settled that it is within the province of an employer to promulgate and enforce a rule prohibiting [] solicitation during working hours," *see* 244 F.3d at 469 (citing 957 F.2d at 1249), the presumed validity of such a narrowly-constructed rule evaporates when it is applied discriminatorily. If a no-solicitation rule is discriminatorily applied or enforced, i.e., applied to union activities as opposed to nonunion activities, that discriminatory application violates § 8(a)(1) of the Act. *NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1021 (5th Cir. 1984).

Nan Ya's posted no-solicitation rule was purported to apply at all times on the Nan Ya work site. On its face, the rule is a blanket prohibition against any solicitation on the work site, which would include union-related solicitation. Such a blanket no-solicitation rule applied to employee attempts to organize is improper under the Act. Furthermore, the Board examined evidence supporting its conclusion that other forms of solicitation were not excluded, whether during working or non-working hours, so long as work was not impacted. *See PNEU Electric, Inc./Nan Ya Plastics Corp. and Int'l Brotherhood of Elec. Workers*, 332 N.L.R.B. No. 60, 2000 WL 1517680, at *8 (Sept. 29, 2000). Even to the extent that an employer may regulate the times in which such solicitation may take place on its property, such a discriminatory application

12

violates § 8(a)(1). Nan Ya went further and, through Safety Manager Bergeron, openly informed Zylks and Aycock that no union-related activity would be tolerated at Nan Ya on the pain of being fired.

Additionally, Pneu-Elect made it clear that Union activities and members were not welcome. Its attitude was reflected in the comments about "union trash" coming "to start trouble" by Foreman Miller; Zylks's and Aycock's segregation from other workers; their being given "dirt work"; the apparently deliberate dropping of a piece of conduit near them from above and Miller's subsequent comments appearing to acknowledge responsibility for the incident; their being told to remove their Union badges; the interrogation of employees regarding union status by Pneu-Elect supervisors; and the obvious efforts to prevent Union members from entering the Pneu-Elect work force.

Under the totality of the circumstances, these acts can only be viewed as an active anti-union animus by Nan Ya and Pneu-Elect, intended to coerce employees away from union organizing activities through a reasonable belief that economic reprisals would result from support for a union.

Before finding whether both Pneu-Elect and Nan Ya have violated § 8(a)(1), however, we must consider whether Nan Ya may be statutorily liable under the Act in this circumstance. Board and Supreme Court precedent recognize that an entity may be an employer within the meaning of the Act without being the direct employer of

13

the affected employees. *See Hudgens v. NLRB*, 424 U.S. 507, 510 n.3 ("[w]hile Hudgens was not the employer of the employees involved in this case, it seems to be undisputed that he was an employer engaged in commerce within the meaning of §§ 2(6) and (7) of the Act. . . . The Board has held that a statutory 'employer' may violate § 8(a)(1) with respect to employees other than his own")(citations omitted) and 522 n.11. The Board in this case specifically identified both Pneu-Elect and Nan Ya as "employers engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act" in its Order. *See* 332 N.L.R.B. No. 60, 2000 WL 1517680, at *20 (Conclusions of Law).

Although Nan Ya is a statutory employer, of concern is whether Pneu-Elect's employee-organizers fall into the employee or nonemployee status with respect to Nan Ya, and whether they were trespassers while organizing. In the context of conducting organizing activities on an employer's property, the Supreme Court has drawn a "distinction [] of substance" between the organizing rights afforded to employees and to nonemployees. *N.L.R.B. v. Babcock and Wilcox Co.*, 351 U.S. 105, 113 (1956). There, the Court reviewed a series of individual cases, all involving union organizers who entered the property of various employers, without permission, for the purpose of distributing literature or leaflets providing information about the respective unions and organizing. In each case, the union organizers were not employees of the

14

targeted employers.  Also in each case, the Board had found that it was unreasonably difficult for the union organizer to reach the employees off company property and assessed a violation of § 8(a)(1) against the employers for refusing the organizers access. *Id*. at 107.  The Court rejected the Board's interpretation because the Board had not taken the difference between employee and nonemployee into account when determining the organizers' access rights.  *Id*. at 112-13.  With certain exceptions, the Court held, "an employer may validly post his property against nonemployee distribution of union literature. . . ."  *Id*. at 112.  It categorically stated that, "[n]o restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline," citing *Republic Aviation Corp. v. N.L.R.B.*, 324 U.S. 793, 803 (1945), "[b]ut no such obligation is owed nonemployee organizers."  351 U.S. at 113.

In *Lechmere, Inc. v. N.L.R.B.*, 502 U.S. 527 (1992), the Court again distinguished employees' from nonemployees' right to access an employer's property for the purpose of union organizing.  There, nonemployee union organizers entered an employer's property, without permission, to post handbills on employees' cars, and related organizing activity. *Id*. at 529-30.  The Board approved an ALJ's cease and desist order against the employer, based on *Jean Country*, 291 N.L.R.B. 11 (1988).  *Id*. at 531.  The Court reviewed

15

whether *Jean Country*, "as applied to nonemployee organizational trespassing [was] consistent with [the Court's] past interpretation of § 7." *Id*. at 536. It determined that *Jean Country* was being "applie[d] broadly to all access cases" by the Board *Id*. at 538 (internal quotation and citation omitted). Further, under *Jean Country,* the Board approached every case by balancing § 7 rights against an employer's property rights, regardless whether the organizers were employees or nonemployees, and relegating the *Babcock* alternative access analysis to being no more than an "especially significant" consideration. *Id*. The Court rejected the Board's casting of the *Babcock* rule as a "multifactor balancing test" and emphasized the applicability and narrowness of *Babcock's* inaccessibility exception to the rule that an employer may post his property against nonemployee distribution of union literature. *Id*. at 539-41.

We note that another circuit court has recently reviewed the issue of nonemployee access to an employer's property for union organizing activities. In *ITT Indus., Inc. v. N.L.R.B.*, 251 F.3d 995 (D.C. Cir. 2001), the court vacated and remanded a Board order granting nonderivative access rights for offsite employees. Employees in that case were employed at several different job sites. On two occasions, employee-organizers from one plant attempted to handbill in the parking lot of another plant, both of which belonged to the same employer. *Id*. at 996. Citing, *inter*

16

*alia*, the property interest concerns articulated in *Babcock* and *Lechmere*, the court held that the Board must take account of an offsite employee's trespasser status as it applied to two areas. First, to the Board's decision to extend nonderivative access rights to offsite employees and, second, to its determination that the scope of those rights be defined by the same balancing test[2] used to assess the scope of onsite employee access rights. *Id*. at 1004-06. In so doing, the court noted that the Board's opinion lacked any discussion of the employer's property rights and of the potential implication of state trespass laws in light of the Supreme Court's prior decisions addressing nonemployee organizers as trespassers. *Id*. at 1005 (citing *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 205 (1978)).

*Babcock* and *Lechmere* involved non-employee union organizers trespassing on employer property and attempting to organize the employer's employees by leafleting and other means. *ITT Indus.* involved offsite employees not employed at the site of the organizing effort. Neither situation is close to the circumstances here, where bona fide employees of an employer operating a distinct work site on the property of another statutory employer, by contract, are the subjects at issue. On its face, the situation appears more closely related to that in *Republic Aviation*, in which

---

[2] As expressed in *Tri-County Medical Center, Inc. v. District 1199*, 222 N.L.R.B. 1089, 1976 WL 7839 (1976).

the Court upheld employees' rights under the Act to conduct union solicitation and organizing activities on their own time, subject to reasonable rules, even on the employer's property. 324 U.S. at 804 and n.10.

The Board has, in fact, based its decisions in two prior, somewhat similar, cases on *Republic Aviation*. In *Southern Serv., Inc. v. N.L.R.B.*, 954 F.2d 700 (11th Cir. 1992), the Eleventh Circuit upheld a Board determination that a contractor providing janitorial services at a Coca-Cola manufacturer's site enjoyed the same organizational rights under the Act as the employer's employees did. In its narrow ruling, the court held that "[w]hen the relationship situates the subcontract employee's workplace continuously and exclusively upon the contracting employer's premises, the contracting employer's rules purporting to restrict that subcontract employee's right to distribute union literature among other employees of the subcontractor must satisfy the test of *Republic Aviation*." *Id*. at 704. While addressing the rule of *Babcock* and its progeny, and emphasizing the distinction between trespassers and nontrespassers implied in *Babcock* and discussed more fully in later cases, the Eleventh Circuit did not address the more recent *Lechmere* case, decided the previous month, with its greater emphasis on the difference in access rights between employees and nonemployees.

In *N.L.R.B. v. Gayfer's Dep't Store*, 324 N.L.R.B. 1246 (1997),

18

the Board addressed a similar issue. Employees of an electrical contractor engaged in remodeling efforts at a Gayfer's store, the contracting employer, in a shopping mall, attempted on several occasions to hand out leaflets and conduct other organizational activities on the store's and mall's premises. The did so at the entrances to the store, outside of the mall and at an interior entrance, aimed at customers and other employees, in violation of Gayfer's no-solicitation policy. The Board upheld a determination that the contracting employer violated § 8(a)(1) with regard to the contractor-employees. In doing so, the Board recognized that *Babcock* and *Lechmere* drew "'a critical distinction between employee and nonemployee solicitation.'" 324 N.L.R.B. at 1249 (quoting *Lechmere*, 502 U.S. at 509). The Board distinguished the Gayfer's situation, in favor of *Republic Aviation*. It noted that, in *Hudgens*, the Supreme Court stated that "[a] wholly different balance was struck [in Republic Aviation] when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved." 324 N.L.R.B. at 1249 (quoting 424 U.S. at 521 n.10). The Board buttressed this by noting that the Court had also stated that "'the nonemployees in Babcock & Wilcox sought to trespass on the employer's property, whereas the employees in Republic Aviation did not.'" *Id.* (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 571

19

(1978)). The Board then analogized the case before it to *Southern Serv.* to determine that the contractor-employees were lawfully on the department store's premises, not "strangers" to it. On that basis, the Board concluded that "their rights to engage in Section 7 activity during nonworking time in nonwork areas of the Respondent's premises are established by the standard of Republic Aviation and not, as the Respondent urges, Babcock & Wilcox and Lechmere." *Id*. at 1250. The Board went on to declare Gayfer's no-solicitation policy invalid as overbroad because on its face, it prohibited protected conduct during periods from the beginning to the end of workshifts, periods that include the employees' own time. *Id* at 1250-51 (citation omitted).

Here, the Board relies on *Gayfer's* and *Southern Serv.* to determine that Pneu-Elect employees Zylks and Aycock "worked exclusively for Pneu-Elect at the Nan Ya site and had full employee rights." *See* 332 N.L.R.B. No. 60, 2000 WL 1517680, at *17. We defer to the Board's reasonable interpretation of the Act. *Lechmere*, 502 U.S. at 536. "When it is unclear under established law whether a category of workers enjoys free-standing, nonderivative access rights, then a court is obliged to defer to *reasonable* judgments of the Board in its resolution of cases that have not as yet been resolved by the Supreme Court." *ITT Indus.*, 251 F.3d at 1003 (emphasis in original). We agree with the D.C. circuit and are concerned that the Board's determination that

*Republic Aviation* controls the contractor-employee situation before us has not provided a sufficiently reasoned analysis in light of *Lechmere* regarding why the Pneu-Elect employees should also be considered employees as to Nan Ya for the purposes of the Act. The Board did not address the issue at all in *Southern Serv.* and did not provide a detailed analysis in *Gayfer's* to "establish[] the *locus* of [] accommodation," *Lechmere*, 502 U.S. at 538, due to a contractor-invitee by a contracting employer. In the Board's Order before us, there is no further analysis. This is a category of workers not previously addressed in Supreme Court precedent. *Republic Aviation* may well be the correct standard to employ as against the contracting employer, considering that a statutory employer may violate § 8(a)(1) with respect to employees other than his own. *Hudgens*, 424 U.S. at 510 n.3.

Regardless, the Board must first determine, considering *Lechmere*, explicitly whether the term "employee" encompasses this relationship between an employer and a contractor-invitee for the purposes of the Act. That will establish the appropriate locus of accommodation.

Once accomplished, the Board should also determine, in view of the Supreme Court cases addressing trespassory conduct in relation to organizational activities, whether the Pneu-Elect employees in this case were trespassing on Nan Ya's property when organizing. Undoubtedly, Louisiana law must be considered as well as the

validity of the restrictions put in place by Nan Ya's no-solicitation rule.

In the event that the Board determines that the Pneu-Elect employees are nonemployees with regard to Nan Ya and are therefore subject to the *Babcock/Lechmere* access analysis, it must also consider whether one of the exceptions to *Babcock* applies. That is, "[t]o gain access, the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists or that the employer's access rules discriminate against union solicitation." *Lechmere*, 502 U.S. at 535 (quoting *Sears, Roebuck & Co.*, 436 U.S. at). The former, the inaccessibility exception, places a heavy burden on the union to show, as "the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity." *Id*. The latter, the discrimination exception, applies "if the employer's notice or order [against nonemployee distribution of union literature] does not discriminate against the union by allowing other distribution." *Babcock*, 351 U.S. at 112. The Board has already found that the Nan Ya no-solicitation policy was invalid for being discriminatorily applied. If reaching this level of analysis, the Board will have to determine whether the discriminatory policy satisfies the second *Babcox* exception.

For these reasons, we vacate that portion of the Board's Order relating to Nan Ya's liability under § 8(a)(1) for coercive anti-

22

union acts and statements toward the Pneu-Elect employees and remand for further determination.

We have no difficulty, on the other hand, determining that the employee-organizers were employees of Pneu-Elect under the Act. The Board's finding that Pneu-Elect violated § 8(a)(1) by coercive treatment of employees is supported by substantial evidence, and we affirm it.

## B. Violation of § 8(a)(3) and (1) by discharging Zylks and Aycock for their union activities.

In addition to alleging a § 8(a)(1) violation for improperly discharging Zylks and Aycock, the Board asserts a violation of § 8(a)(3) against both Pneu-Elect and Nan Ya. That section establishes an employer's unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." *See* 29 U.S.C. § 158(a)(3). Section 8(a)(3) therefore prohibits such discrimination based on union-related activity. "Thus, 'it is elementary that an employer violates section 8(a)(3) and (1) of the Act by discharging employees because of their union activity.'" *See Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488 (5th Cir. 2001)(quoting *NLRB v. Adco Elec.*, 6 F.3d 1110, 1116 (5th Cir. 1993), in turn citing *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 397-98 (1983)). The Board bears the burden of proving through direct or circumstantial evidence that anti-union

23

animus was a "motivating factor" in the decision to discharge the employee, and the evidence must support a reasonable inference of causal connection between the employer's anti-union motivation and the employee's discharge. If the Board meets this burden, it establishes a *prima facie* case of discriminatory discharge, and the employer must present evidence showing that the employee would have been discharged even absent the protected activity. *Poly-America*, 260 F.3d at 488-89 (citations omitted).

The record reflects that Zylks and Aycock were targeted as "union guys" from the moment they were hired, and particularly after they announced their union affiliation and intent to organize. In addition to the public comments reflecting hostility toward the union affiliation, two Pneu-Elect foremen discussed "getting rid of" non-union workers specifically to camouflage terminating Zylks and Aycock. Field Manager Zeringue continually alluded to work being available, but stated that the first to be laid off would be "those union guys." Zeringue also met with Nan Ya Safety Manager Bergeron about the presence of Zylks and Aycock, and later arranged for Bergeron to meet with them after they tried to register a complaint about safety conditions on the job site.

Bergeron, acting for Nan Ya, told Zylks and Aycock that there would be no union organizing or solicitation on the Nan Ya job site whatsoever. When they replied that they were entitled to do so, Bergeron ordered them off of the property and told them that they

were fired. Zylks and Aycock challenged the issue with Zeringue, who refused to override Bergeron's order and accused them of interrupting others' work. CEO Colomb later acceded to Nan Ya's blanket no-solicitation policy, though a proper restriction during actual working hours might have been enforceable. Anti-union animus motivating the discharge is a reasonable inference supporting the Board's *prima facie* case of discriminatory discharge.

Pneu-Elect and Nan Ya argue that Zylks and Aycock were fired for soliciting -- or not working -- during working hours and for being disruptive in the process. Pneu-Elect did not have a formally published "no solicitation" rule, whether focused at only during working hours or at any time on the work premises. Nonetheless, Pneu-Elect contends that such a policy was in effect and the Board found that such a policy was in effect.

Nan Ya did have a posted "no solicitation" rule and claims that Zylks and Aycock violated it when soliciting for the Union, conducting labor organizing activities, and being disruptive during working hours.

Certainly, an employer has the right to restrict organizing activities, or other types of solicitation, on the employer's property to those times not involving working hours. *Valmont Indus.*, 244 F.3d at 469. That is not what Nan Ya required, and Pneu-Elect acceded to, here. Nan Ya's posted regulation prohibited

25

any solicitation at all. From the content of Bergeron's orders, and the comments of various Pneu-Elect supervisors, the prohibition was aimed against union organizing. Neither Nan Ya nor Pneu-Elect have provided any evidence that the no-solicitation rule was enforced in any other context. Such discriminatory application violates § 8(a)(1) of the Act. *NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1021 (5th Cir. 1984). Zylks's and Aycock's discharge, on the basis of the discriminatory application, was predicated on and motivated by the employers' anti-union animus and is a violation of § 8(a)(3). There is substantial evidence in the record to support the Board's findings in this regard, and we therefore affirm them.

Nan Ya further contends that it cannot be held responsible under § 8(a)(3) because Pneu-Elect was merely under a short-term contract and was the sole employer of the discharged employees. Nan Ya need not be the direct employer, however. "An employer violates [§§ 8(a)(3) and (1)] when it directs, instructs, or orders another employer with whom it has business dealings to discharge, layoff, transfer, or otherwise affects the working conditions of the latter's employees because of the union activities of said employees." *See Dews Const. Corp.*, 231 NLRB 182, 183 n.4 (1977)(citing cases), *enforced*, 578 F.2d 1374 (3rd Cir. 1978); *Int'l Shipping Ass'n., Inc.*, 297 NLRB 1059 (1990)(citing cases). In this case, the record as a whole provides substantial evidence to support the Board's conclusion that Nan Ya's Safety Officer,

26

Bergeron, ordered Zylks and Aycock off of the Nan Ya premises and told them that they were fired. Further, that Bergeron repeated the same to Pneu-Elect Field Manager Zeringue and effectively forced Pneu-Elect CEO Colomb to refuse to let Zylks and Aycock return to work unless they refrained from organizing.

**C. Violation of § 8(a)(3) and (1) by discriminatorily refusing to consider known union supporters.**

This issue applies only to Pneu-Elect's apparent refusal to consider three IBEW members' applications for employment.

The NLRB argues that its decision in *FES (a Division of Thermo Power) and Plumbers and Pipefitters Local 520 of the United Assoc.*, 331 N.L.R.B. No. 20, 2000 WL 627640 (May 11, 2000) should provide the appropriate analysis in this refusal-to-consider situation. That is, to establish a discriminatory refusal to consider, the Board's General Counsel bears the burden of showing (1) that the respondent excluded applicants from a hiring process; and (2) that anti-union animus contributed to the decision not to consider the applicants for employment. Once established, the burden shifts to the employer to show that it would not have considered the applicants even in the absence of their union activity or affiliation. If the employer fails to meet its burden, a violation of § 8(a)(3) is established. *FES*, 331 N.L.R.B. No. 20, 2000 WL 627640, at *10; *Int'l Union of Operating Engineers, Local 147, AFL-CIO, v. NLRB*, No. 01-1301, 2002 WL 1461724, at *3-4 (D.C. Cir. July

27

9, 2002). This approach, however, obviates an examination of whether the excluded applicants are qualified for the applied-to position, or even if any position exists at all to be filled. The Board asserts that, regardless of qualifications or available openings, a blanket refusal to consider union-related applicants excludes them from the hiring process completely and that such a discriminatory refusal is a deterrent to employees' engaging in the right of self-organization. On that basis, the Board contends that Pneu-Elect's demonstrated anti-union animus and its alleged blanket refusal to consider any union-related applicants for hire, without more, constitutes a violation of § 8(a)(3).

We think that the approach taken by the Sixth Circuit in *NLRB v. Fluor Daniel*, Inc., 161 F.3d 953 (6th Cir. 1998), may provide a better basis for analyzing a refusal-to-consider charge. Under *Fluor Daniel*, there are two elements to a § 8(a)(3) violation: (1) anti-union animus and (2) the occurrence of a covered action such as a particular failure to hire. *See Fluor Daniel*, 161 F.3d at 966 (citing *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 395 (1983)). After the Board's General Counsel has proven each element, the employer must present evidence that the employees in question would not have been hired, even if they had not been involved with a union. 161 F.3d at 966. There can be no violation if there was no refusal to hire or if there were no positions available of the type applied for. *Id*. at 966-67. Therefore, in

reviewing a § 8(a)(3) claim under a *Fluor Daniel*-type analysis, we would have to determine that not only did anti-union animus exist, and that a failure to hire circumstance occurred, but also that the employees involved were actually qualified for the respective job positions and that there were job positions actually available. This approach seems the more equitable balance between the interests of individual applicants and those of the employer, who otherwise might be exposed to liability even if it legitimately had no job openings available at all.

In this situation, analysis under either of the tests supports the Board's finding of discriminatory refusal to hire. If we were to find that applicants Kendrick Russell, Donald Longupee, and Roland Goetzman were unqualified for the positions applied for, or that Pneu-Elect had no job openings available at the time, we would have to decide whether to ultimately employ the *FES* test propounded by the Board or the *Fluor Daniel* test established by the Sixth Circuit. Because we find that the applicants were qualified and that Pneu-Elect did have jobs available at the time of application, we need not determine with finality which test to follow.

As recently as June 21, 1996, Pneu-Elect CEO Colomb attempted to return Zylks and Aycock to work as electricians, with the caveat that they stop organizing during working hours. That indicates that there were electrician positions available with Pneu-Elect at the Nan Ya work site and that at least the two positions vacated

29

when Zylks and Aycock were open.  On June 24, electrician Russell Anderson inquired about electrician positions with Pneu-Elect and was told by Field Manager Zeringue that the company had jobs available and needed people, at least through the end of the week.

The following day, Russell, Longupee, and Goetzman presented themselves at the job site, identified themselves as IBEW organizers, wore Union buttons, and asked to apply for electrician jobs with Pneu-Elect.  They represented themselves as electricians on the Union's out-of-work list, which Pneu-Elect has not challenged.  Field Manager Zeringue told them that he was cutting back that day.  CEO Colomb then told the three aspiring applicants that Pneu-Elect was laying off employees and that there were no positions available, despite Zeringue's representation to Anderson the day before.  Colomb also told the three that there were no application forms available at the job site for them to fill out, requiring them to go instead to the company's office in Lafayette. Colomb later told Zeringue and Foreman Miller that they should tell the union-related applicants the same thing.  Regardless, that same day, Anderson, with no apparent union affiliation, presented himself at the work site and was given a job application.

Whether following *FES* or *Fluor Daniel*, the Board's findings are supported by substantial evidence.  There were jobs available the day before Russell, Longupee, and Goetzman presented themselves for applications, and with strong likelihood that same day, based

on the company accepting Anderson's application for consideration. Pneu-Elect has not challenged their qualifications for the work at Nan Ya. Under the totality of the circumstances, there was certainly an anti-union animus present within Pneu-Elect and, given the commentary by Colomb and Zeringue, this animus contributed to the company's decision not to consider the three union-affiliated applicants. Consideration for their employment was refused with their refused attempt to apply, though an applicant without apparent union affiliation was later considered. On this basis, we affirm the findings of the Board that Pneu-Elect's discriminatory refusal to consider the three violated §§ 8(a)(3) and (1).

The record also shows, however, that Pneu-Elect did not hire any applicants for the Nan Ya job site after Russell, Longupee, and Goetzman attempted to apply and were refused. The only hires made by Pneu-Elect were for other jobs in other locales; Russell did in fact apply for a position at any of the sites via Pneu-Elect's office in Lafayette and the company accepted his application. Russell was not hired for any of the other sites because, according to Colomb, his application reflected a lack of any recent or significant experience. Because there were no subsequent hires for the Nan Ya work site, we decline to enforce the Board's order as it pertains to requiring a hearing in the compliance stage regarding whether Russell, Longuee, and Goetzman might have been hired at the Nan Ya work site but for the discriminatory refusal to consider them. It is difficult to see how they would be eligible to be

31

"made whole" for any losses that could not have been incurred to begin with.

## IV. CONCLUSION.

For the reasons stated herein, we VACATE that portion of the Board's Order regarding Nan Ya's § 8(a)(1) liability for coercive anti-union acts regarding Pneu-Elect's employees and REMAND for further determination. The Board's petition for enforcement of its order is otherwise GRANTED, except insofar as it directed hearings in the compliance stage regarding losses by Russell, Longupee, and Goetzman when no electricians were hired by Pneu-Elect for the Nan Ya site after June 25, 1996.