DENNIS, Circuit Judge,
dissenting:
I respectfully dissent from the majority’s decision granting Brown & Root’s petition for relief and denying the NLRB’s cross-petition for enforcement. We must enforce an NLRB decision if it is “supported by substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(e). Therefore, if there is “such rele *642 vant evidence as a reasonable mind would accept to support a conclusion,” we must defer to the NLRB, even if we would have decided the case differently. Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Considering this deference, I would deny Brown & Root’s petition for relief and enforce the NLRB order in its entirety.
The NLRB found that Brown & Root violated NLRA sections 8(a)(1), 8(a)(3), and 8(a)(5) when it took over the packaging and material handling department from Brown-Eagle. It relied on the following evidence, which showed that: (1) Brown & Root expressly stated that it intended to hire a “large portion” and “significant number” of the Brown-Eagle workforce to assure a smooth transition; (2) Outlaw was the highest ranking Brown & Root official at Ciba and made the final hiring decisions when Brown & Root took over the packaging and material handling department; (3) at a meeting to- discuss the takeover, Outlaw responded to questions about the future of the current union by stating that “Brown & Root was a nonunion company and was going to stay that way” and that “if the [Brown-Eagle] employees came to work for them they would be non-union”; (4) after the meeting, the Union attempted to deliver demands for recognition and signed membership cards to Outlaw, who refused to accept them; (5) Brown & Root hired 78% of the Brown-Eagle supervisors that applied; (6) although the Brown-Eagle supervisors were hired before the general application process began, Brown & Root failed to solicit their advice regarding the Brown-Eagle applicants; (7) the field hiring policy granted preferences to applicants who were former Brown & Root employees or referred by current Brown & Root employees, but not to former Brown-Eagle employees who had worked in the packaging and material handling department; (8) Brown-Eagle applicants, however, were not required to pass a written test before proceeding to the structured interview because “they were already on the project performing the work”; (9) during the structured interview, applicants were not asked about any specific job skills or their recent job performance; (10) despite its initial intentions to hire Brown-Eagle employees to ensure a smooth transition, Brown & Root hired only 25% of the Brown-Eagle employees who applied; and (11) ten former Brown-Eagle employees with preferences in the Brown & Root hiring policy were not hired, although eighteen non-Brown-Eagle employees with no preference were hired. Because this evidence is sufficient to support the NLRB’s findings, its order against Brown & Root should be enforced.

I. Section 8(a)(1) Violation

The section 8(a)(1) violation must be upheld if, considering the totality of the circumstances, there is substantial evidence showing that Outlaw made statements that specifically intended to impede or discourage union involvement and threatened reprisals if the employees supported the union. Selkirk Metalbestos, N.A. v. NLRB, 116 F.3d 782, 788 (5th Cir.1997); In re Whirlpool Corp., 337 NLRB No. 117, 2002 WL 1805433 at *9 (July 5, 2002). This includes statements by an employer that it would be futile to select a bargaining agent. In re Whirlpool Corp., 337 NLRB No. 117, 2002 WL 1805433 at *9. The key determination is whether the statements tend to be coercive, not whether the employees have in fact been coerced. NLRB v. PNEU Electric, Inc., 309 F.3d 843, 850 (5th Cir.2002). Therefore, the relative sophistication of the Brown-Eagle employees or whether they still applied for positions after Outlaw’s comments is irrelevant.
*643 This violation is supported by substantial evidence. Outlaw was a person of authority and an official representative of Brown & Root. He also made the final decisions as to which, if any, Brown-Eagle applicants would be hired. He stated at a meeting designed to address the Brown-Eagle employees’ questions about the transition that “Brown & Root was a non-union company and was going to stay that way” and that “if the [Brown-Eagle] employees came to work for them they would be nonunion.” Obviously, the responses by a person in Outlaw’s position at an official meeting designed to answer such questions would be taken seriously and could, therefore, be considered coercive. It is also clear that these statements were specifically intended to discourage union involvement because Outlaw followed through on these promises, and hired only about 25% of the Brown-Eagle applicants. Therefore, the NLRB could have found that Outlaw’s statements violated section 8(a)(1) because these statements would tend to coerce an employee that it would be futile to belong to a union at Brown & Root.
Additionally, the NLRB was not required to find that the statements were protected by section 8(c). An employer’s statement will be protected by section 8(c) if his comments are true statements of objective fact or do not constitute a threat of reprisal-. 29 U.S.C. § 158(c); In re P.S. Elliott Serv., 300 NLRB 1161, 1990 WL 257497 (1990). But here, Outlaw’s statements were not true statements of objective fact. Although he did correctly state that Brown & Root was a non-union company, Brown & Root could not through lawful means guarantee that the packaging and material handling department would become non-union when it took over. Nor could Brown & Root truthfully maintain that the doctrine of successorship would not prevent its efforts to require a nonunion shop with all non-union employees. His comments could also be reasonably construed as a threat. By stating that Brown & Root intended to stay non-union, he reasonably could be understood to imply that it would do what is necessary to stay non-union. Therefore, the record supports the Board’s finding that Outlaw made an implied threat that Brown & Root would not hire Brown-Eagle employees if hiring these employees would result in the unionization of the department. Accordingly, because Outlaw’s statements were not protected by section 8(c), the section 8(a)(1) violation should be upheld.

II. Section 8(a)(3) Violation

I would also enforce the section 8(a)(3) violation. To establish this violation, the NLRB must find that anti-union animus motivated an employer to make an adverse employment decision. See 29 U.S.C. 158(a)(3); NLRB v. Houston Distrib. Servs., 573 F.2d 260, 263-64 (5th Cir.1978). Under the burden-shifting analysis of Wright Line, the NLRB is first required to show that a motivating factor in an adverse employment decision was anti-union animus. See Valmont Indus., Inc. v. NLRB, 244 F.3d 454, 464-65 (5th Cir.2001). If it does, then the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action regardless of its anti-union stance. See id.
Here, there is substantial evidence to show that anti-union animus was a motivating factor in Brown & Root’s decision not to hire a majority of the Brown-Eagle applicants. In addition, Brown & Root has not proven that it would have hired the same number of Brown-Eagle applicants even if it had not been trying to avoid unionizing the packaging and material handling department. Therefore, the section 8(a)(3) violation should be upheld.
*644 As the majority explains, under the NLRB’s version of events, Brown & Root planned to hire mostly Brown-Eagle applicants in order to ensure continuity when it took over the department. But, as the NLRB reasonably found, when it realized that these Brown-Eagle applicants were adamant about remaining unionized, it decided to avoid any union concerns caused by the successorship doctrine and hired only a minimal amount of Brown-Eagle applicants. Because the NLRB could reasonably determine that Brown & Root’s decision not to hire Brown-Eagle applicants was motivated by its desire to remain non-union, Brown & Root’s violation of section 8(a)(3) is supported by substantial evidence.
The majority does not contend that this version of events is incapable of supporting a section 8(a)(3) violation. Instead it concludes that the NLRB’s account was not supported by substantial evidence and thus was mere speculation. I disagree. There is substantial evidence to support every aspect of the NLRB’s theory. Therefore, I believe the NLRB proved that a motivating factor behind Brown & Root’s hiring decisions was anti-union animus.
First, Brown & Root expressly stated that it planned to provide continuity of service by “using a large portion of the existing Material Handling work force” and “to hire a significant number of the existing work force to assure a smooth changeover.” Brown & Root argues that this meant it only intended to hire about a quarter of the Brown-Eagle applicants. But the NLRB could still have concluded that this 25% figure was not “large” or “significant,” and that by its own statements Brown & Root originally intended to hire more Brown-Eagle applicants than it actually did.
Second, between the time Brown & Root made these statements and the hiring process began, the Brown-Eagle applicants made it abundantly clear that they would insist on remaining unionized. At the meeting with Outlaw, they asked numerous questions about unionization. Shortly thereafter, the Union delivered letters to both Brown & Root headquarters and Outlaw demanding to be recognized. Even if Brown & Root knew that the department was unionized before the meetings, it did not necessarily know the extent of the Brown-Eagle employees’ fervor for remaining union employees. Therefore, this evidence supports the NLRB’s finding that Brown & Root re-evaluated its hiring policies and decided to avoid hiring a majority of Brown-Eagle applicants after these events occurred.
Third, although it did hire some Brown-Eagle applicants, there is substantial evidence showing that Brown & Root’s hiring process as a whole was based more on remaining non-union then on hiring the best possible applicants. Brown & Root hired only 25% of the Brown-Eagle employees, but hired 78% of its supervisors, who have no effect on the successorship doctrine. Then it chose not to ask these supervisors about the qualifications of the Brown-Eagle employees, even though they would have provided valuable knowledge about these employees’ abilities.[1] Brown & Root then proceeded to hire a number of non-Brown-Eagle applicants without a preference under the field hiring policy while rejecting a number of Brown-Eagle employees who had a preference. In addition, no applicant was asked about any specific job skills or recent job perfor- *645 manee during the structured interview. Based on this evidence, it was more than reasonable for the NLRB to conclude that Brown & Root was more concerned about avoiding the doctrine of successorship than in hiring the best applicants.
If there were still doubt about Brown & Root’s motivations, it is alleviated by Outlaw’s statements at the Brown-Eagle employee meeting. These statements clearly show that Brown & Root was concerned about the future union status of the department and explains the primary motivation behind Brown & Root’s actions during the hiring process — to avoid unionization. Therefore, the NLRB has adequately proven that anti-union animus was a motivating factor behind the NLRB’s decision not to hire most of the Brown-Eagle applicants.
After the NLRB made its case, the burden shifted to Brown & Root to prove that it would have made the same hiring decisions even if it had no anti-union animus. It has not done so here. As noted by the majority, Brown & Root claims that it hired Brown-Eagle applicants with a preference under the hiring policy at a somewhat higher rate than non-Brown-Eagle applicants with a preference. It also hired Brown-Eagle applicants without a preference at a higher rate than similarly situated non-Brown-Eagle applicants. Although true, these statistics do not take into account the fact that Brown-Eagle applicants should have been hired at a significantly higher rate because of their experience. As noted above, preferences were not given based on previous experience with this type of work, but were instead based on being a former Brown & Root employee or being referred by a current Brown & Root employee. Thus the numbers that result from comparing applicants with or without preferences does not take into account that, as a whole, the Brown-Eagle applicants were vastly more experienced then their counterparts.
Initially, Brown & Root had admired this experience. It acknowledged the importance of the Brown-Eagle employees’ experience when it stated that it wanted to hire a significant number of these applicants to ensure continuity and when it did not require them to pass the written test before moving on to the structured interview. But it never provided an adequate explanation why this experience was suddenly irrelevant after the Brown-Eagle employees displayed pro-union sentiments or why it rejected so many of these experienced Brown-Eagle employees who applied for positions. Because Brown & Root failed to provide such an explanation, the NLRB was not required to find that Brown & Root would have made the same hiring decisions absent its anti-union animus. Consequently, the section 8(a)(3) violation should be upheld.

III. Section 8(a)(5) Violation

Finally, because Brown & Root had a duty to bargain with the Union as a successor employer, it violated section 8(a)(5) by refusing to bargain with the Union. Under the doctrine of successorship, a new employer who takes over a unionized unit has an obligation to bargain with the union if: (1) that new employer is in fact a successor of the old employer and (2) the majority of its employees were employed by its predecessor. Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 41, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). Whether an employer is in fact a successor “is primarily factual in nature and is based upon the totality of the circumstances.” Id. at 43, 107 S.Ct. 2225. It focuses on whether “the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor’s busi *646 ness operations,” keeping in mind whether “those employees who have been retained will understandably view their job situations as essentially unaltered.” Id. A new employer will be considered the successor employer of its predecessor if there is “substantial continuity” between the two operations. Id.
Brown & Root is a successor employer of Brown-Eagle. First, Brown & Root did not start a new operation, instead taking over Brown-Eagle’s contract to run the already-existing packaging and material handling department for the same customer, Ciba. As a result, its employees’ positions were essentially unaltered because they performed the same work under the same conditions for almost all of the same supervisors. Therefore, there was substantial continuity between the Brown & Root and Brown-Eagle operations. Second, but for its discriminatory hiring practices, as found by the NLRB based on substantial evidence, Brown-Eagle applicants would have constituted a majority of the Brown & Root workforce in this department, which would have satisfied the second prong of the successorship doctrine.
Because it cannot benefit from its unlawful practices, we must uphold the NLRB’s finding that Brown & Root was a successor employer and had a duty to bargain with the Union. In re Galloway, 321 NLRB 1422, 1425, 1996 WL 514510 (1996) (holding that a section 8(a)(3) violation is sufficient to find that the new employer “would have employed a sufficient number of predecessor employees to be a successor employer had it acted lawfully”). In addition, because of its discriminatory acts, Brown & Root also lost the right to set the initial terms and conditions before bargaining with the Union. Id. at 1427, 1996 WL 514510. Accordingly, by refusing to bargain with the Union, Brown & Root violated section 8(a)(5). Therefore, the NLRB was justified in requiring Brown & Root to abide by the previous bargaining agreement until a new agreement with the Union can be negotiated. Id.

IV. Conclusion

In sum, we must defer to the NLRB as long as its findings are supported by substantial evidence. Because its findings are so supported in this case, I would deny Brown & Root’s petition and enforce the NLRB order.

. This choice was doubly significant because those supervisors could have recommended some of the Brown-Eagle applicants, which would have given those applicants a preference under the hiring policy.