**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROOKSHIRE GROCERY CO., Respondent.**

No. 87–4258.

United States Court of Appeals, Fifth Circuit.

Feb. 22, 1988.

Barbara A. Atkin, Elliott Moore, Deputy Associate Gen. Counsel, NLRB, Beverly A. Oyama, Washington, D.C., for petitioner.

Brynely James, III, David L. Treat, San Antonio, Tex., Wendell Hall, Robert S. Bambace, Fulbright & Jaworski, Houston, Tex., for respondent.

Michael Dunn, Director, Fort Worth, Tex., for other interested parties.

Before CLARK, Chief Judge, JOLLY and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal requires us to examine whether substantial evidence supports the National Labor Relations Board ("Board") decision that Brookshire Grocery Company ("Brookshire") violated Section 8(a)(1) and (3) of the National Labor Relations Act ("Act") when it discharged its employee Homer Evans for allegedly falsifying a short term medical disability form. Upon review of the record as a whole, we conclude that substantial evidence will not support a conclusion that the company was motivated by union animus in the discharge of Evans. We therefore deny enforcement.

I

Because the sole issue in this case is whether substantial evidence supports the Board decision, we deal at length with the factual history. In examining the facts, we accept the Administrative Law Judge's account of the events from the time of Evans' first union activity until his discharge.

Brookshire operates a chain of retail grocery stores in Texas, Louisiana, and Arkansas. Homer Evans worked as a truck driver for Brookshire from 1979 until his discharge in October of 1985. On April 13, Evans attended a union meeting and signed a union card. As far as the record indicates, this constitutes Evans' sole union activity. On May 31, Evans reported to work and was told by Brookshire's dispatcher that his usual truck was unavailable and he would have to drive a different one. After Evans surveyed the age and general condition of the truck he was to drive, he complained to the dispatcher about the reassignment. On June 4, Evans was called to the office of the company transportation supervisor, David Hollis, who, apparently did not like the complaints and other reactions of Evans over his reassignment. Evans, apparently sensing that some trouble might be brewing, asked fellow truck driver, David Nelson, to accompany him to the meeting. Nelson's presence did not set well with Hollis who asked him to leave. Evans interjected, however, that he wanted Nelson to remain in order to witness that he was informing Hollis that he was involved in the union activities that were occurring at the facility. Once this statement was made and Nelson made his departure, Hollis brought up Evans' complaints about his assigned truck. He concluded by permanently assigning Evans a particular truck, which was one of the oldest in the operating fleet.

After his discussion with Evans, Hollis was still stewing over the brief encounter with Nelson. He sought him out and told him that he would not be driving any more, but would have to work in Brookshire's

return center. In about four hours, Hollis apparently cooled off, because he rescinded Nelson's reassignment.

In the meantime, Hollis did not rescind Evans' assignment to the truck, which he drove the night of June 4 on his regular route. As a result, Evans experienced back pain that prompted him on the next day to visit his chiropractor, Dr. Bratcher, who recommended that Evans take some time off to improve his back condition.

Evans also complained to the company that the truck was riding roughly, causing him back pain and discomfort. The company promptly replaced the old seat in the truck with a new one on the day after he made the complaint.

Although Evans briefly returned to work, his back problems persisted, and he was away from his job for about one month. He consequently began drawing short-term disability benefits through the company's program while also filing a worker's compensation claim. On June 28, at the company's request, Evans saw Dr. Collins, a neurologist, who recommended that Evans attend "back school" to learn techniques for caring for his back. At about the same time, Evans and his chiropractor decided that Evans' condition had improved sufficiently to allow him to return to work, which he did on July 8. Evans advised the company that although Dr. Collins had recommended that he attend back school, he wished to postpone the school because it would take two or three weeks.

From the time of his return in July until October, Evans' story is uneventful except for one incident. In August, several truck drivers were talking about an accident involving one of the drivers. When Hollis overheard the conversation, he commented that it was too bad that it had not happened to Evans.

In early October Evans' back problems recurred. On October 10, he visited his chiropractor who again recommended that Evans take time off from work to rest his back. He also thought it a good idea for Evans to attend the back school. On October 11, Evans advised the company that he required time off to rest his back and to attend back school. As apparently was customary, Evans was required to submit a short-term disability form in order to obtain benefits during his absence.

The stage is thus set for Evans' discharge, which the company based upon its belief that Evans had falsified this form in order to obtain benefits. Under the company plan an employee was required to see a doctor in order to claim payment for medical absences. The alleged falsity arose from the answer to the question: "When were you personally examined by your doctor?" Evans answered by writing the date: "October 10, 1985." Indeed, this was the most recent date that Evans had seen his chiropractor, Dr. Bratcher. The other side of the form, however, provided questions for "Examining Physician's Statement." These questions were, at Evans' request, completed by Dr. Collins' staff and signed by Dr. Collins on October 14, 1985, whom Evans in fact had not personally seen since June 28. Evans stated that he had Dr. Collins and his office complete side two of the form at the suggestion of his chiropractor since it was Collins who had originally advised attending the back school. The second page of the form, also filled out by Dr. Collins' staff, erroneously stated that Evans had been continuously disabled from June 28, the last time Dr. Collins had seen him, until October 14, 1985.

Evans then completed back school in one day, on October 15, but remained away from work for the remainder of the week.

Later, a company personnel clerk was processing Evans' form for payment and noticed that on page one he stated that he had seen his doctor on October 10, but on page two the doctor stated that he had not seen Evans since June 28. The clerk called Dr. Collins' office to clarify when the last time Evans had seen Dr. Collins. During the conversation, the personnel clerk told someone in Collins' office, "Well, we have had a lot of trouble with this man and ... he has been involved in a lawsuit."

After her conversation with the doctor's office, the personnel clerk informed Greg Nordyke, the Transportation Manager, of

the discrepancy in Evans' form. Nordyke then personally visited Collins' office and was told by Collins that he had not examined Evans on October 10. Collins also told Nordyke that it was not necessary to miss more than one day of work for the back school. Nordyke also personally called the back school and confirmed that Evans had participated in the school's program for only one day.

After completing his investigation, Nordyke then discussed the situation with Adams, Brookshire's Operations Director, and they concluded that Evans had violated the company's policy manual by falsifying company documents, i.e., the short-term disability form. It is undisputed that under the terms of the policy manual, falsification of company documents is grounds for dismissal. It is also undisputed that the alleged misrepresentation was material since it was necessary to see a doctor in order to claim disability benefits.

On October 21, Evans was fired by Adams and Nordyke for falsifying company documents by stating that he had seen his doctor on October 10 when in fact he had not. Evans protested that he had in fact seen "my doctor" on October 10. However, he did not name which doctor he had seen. He then looked at Adams and asked "But you don't care about that, do you?" Adams replied, "No."

After Evans had filed an unfair labor practice charge and the Board investigation had begun, Nordyke called Evans' chiropractor, Dr. Bratcher, and verified the Board's allegation made to him that Bratcher had seen Evans on October 10. Nordyke, however, did not rescind his decision to discharge Evans.

## II

The Board, in a split decision, agreed with the Administrative Law Judge that "a prima facie showing has been made that Evans' discharge was in violation of the Act and the Respondent did not adequately

rebut this case." It reasoned that a prima facie case was evidenced by the "ongoing hostility" of Hollis toward Evans. When Hollis determined in the June 4 conference that Evans was pro-union, he retaliated, according to the Board, by assigning him to a substandard truck. Hollis continued to display union animus toward Evans, the Board reasoned, when he made the comment to the employees that it was too bad Evans had not been involved in the accident they were discussing. The Board found that management's motivation could be inferred further from its "hasty and unfounded" discharge of Evans. It thought that management's investigation of the disability insurance form was "cursory and ineffective," thus further evidencing union animus toward Evans.

The dissenting member of the Board panel thought no prima facie case had been made to support an inference that Brookshire had discharged Evans "because he engaged in union or other protected concerted activity." In a lengthy dissenting opinion, Chairman Dotson was unimpressed that Evans had engaged in any significant union activity. Furthermore, in his view, there was no evidence that would connect Evans' assignment to the substandard truck with his union activity.[1] He found no significance in Hollis' assignment of David Nelson to a four-hour stint in the return center, and he thought that Hollis' remark that it was too bad Evans had not been involved in the accident was flip and made in jest. Nor could the chairman find any significance between the personnel clerk's remark, "We have had a lot of trouble with this man and he has been involved in a lawsuit," and alleged union activity. Finally, the dissenting chairman thought that the Administrative Law Judge had given no consideration to the fact that the discharge occurred over six months after Evans' only union activity, had given no consideration to the absence of any union activity on Evans' part during the intervening half-year period prior to his discharge, and

1. The record indicates that Evans was first assigned to a substandard truck on May 31, 1985. Evans was later permanently assigned to a different substandard truck on June 4. The record

further shows that in the preceding six months Evans had been assigned to several different trucks, although he testified that he usually drove one or the other of two particular trucks.

most significantly, had given no consideration to the "complete absence of evidence of union animus on the part of Respondent."

## III

The only question for us to determine is whether substantial evidence, taken from the record as a whole, supports the Board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Centre Property Management v. NLRB*, 807 F.2d 1264, 1268 (5th Cir. 1987). Recognizing that Brookshire's motive in discharging Evans is the central fact it has to establish, the Board argues that motive is a question of fact for the Board to determine, and that circumstantial evidence alone may be sufficient in proving an employee's motive. It contends, essentially for the reasons earlier pointed out in the Board's majority opinion, that, although union animus on the part of the company is supported only by circumstantial evidence, it is sufficient for the Board to conclude that Brookshire discharged Evans because of his union activities. The Board points out that only rarely will there be direct evidence that a company has fired an employee because of his union sentiment.

Brookshire argues that there was simply no evidence, direct or circumstantial, of union animus on its part and that although Evans may have been discharged for a reason that later turned out to be mistaken, an employee's reliance on a mistaken but sincere belief negates a finding of anti-union motivation, *citing Jefferies v. Harris County Community Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir.1980), and *Wyman–Gordon Co. v. NLRB*, 654 F.2d 134 (1st Cir.1978). Because there is an absence of any anti-union motivation in the discharge of Evans, Brookshire, citing *Syncro Corp. v. NLRB*, 597 F.2d 922, 924 (5th Cir.1979), argues that it could legally terminate Evans for good cause, bad cause, or no cause at all without violating the Act.

## IV

It is clear that the standard of review on appeal of a Board order requires us to enforce the Board order if the record, taken as a whole, shows substantial evidence that supports the Board's findings. In determining whether there exists substantial evidence to support the Board's findings, however, we must also consider evidence that fairly detracts from the Board's decision. *Centre Property*, 807 F.2d at 1268. Thus, although our scope of review is limited, we "should deny enforcement if, after a full review of the record, we are unable *conscientiously* to conclude that the evidence supporting the Board's determinations is substantial." *Mueller Brass Co. v. NLRB*, 544 F.2d 815, 817 (5th Cir.1977).

After our careful review of the record, we find ourselves in substantial agreement with the dissenting chairman of the Board. We simply do not think the record will support the reasoning and the conclusions of the Board.

In the first place, there is a *total* absence in this record of any hostility on the part of Brookshire toward the union. Although there is some evidence of the company's dislike of Evans, there is simply no evidence to conclude that this attitude was based upon the company's anti-union sentiments. Indeed, the record indicates that, to the extent that the company bore antipathy toward Evans, it was more likely the result of the complaints that he voiced against, and his conduct in connection with, his assignment to the substandard truck. Alternatively, or in combination, rather than reflecting hostility on account of the union, the record indicates that the antipathy is more likely to have resulted from arguably unjustifiably long absences on account of his back problems. In short, we find an absence of evidence that any dissatisfaction on the part of the company with Evans resulted from his union activity, which itself was truly minimal.

Second, the minimal amount of union activity that Evans engaged in detracts from the conclusion that this was the reason for the company's dissatisfaction with him. He only went to a union meeting and signed a card in April. It was not until late May that he was reassigned to a substandard truck. The record indicates that sever-

al people were at the union meeting, each of whom engaged in as much union activity as did Evans. The record is totally silent that any of the other union participants suffered any discrimination, however slight, with the possible exception of the employee David Nelson who attended the June 4 conference with Evans. And, indeed, there is no evidence that would suggest that the "discrimination" that Nelson suffered resulted from union activity on his part, but rather resulted from his unwelcomed presence in the June 4 meeting. At any rate, the "discrimination" that he suffered was only a four-hour reassignment. In short, there is no explanation, vis-a-vis his union activity, why Evans would have been picked out above all others who had equally offended the alleged anti-union sensibilities of the company.

Third, the Board concluded that "management's motivation" may also be inferred from its "hasty and unfounded discharge" of Evans. We find no evidence in the record that would indicate that management was "hasty" or "unfounded" in concluding that Evans had falsified the medical claim form. It conducted a telephone investigation and a personal investigation, including a conversation with the doctor to verify that the information, as reported by Evans and as appeared on the form, was indeed false. We find no basis to call the decision "hasty" after an investigation and consultation over several days. Nor can we characterize the discharge as "unfounded" as of the date of his discharge. We cannot imagine that the Board would find it an "unfounded" basis for discharge that an employee had made materially false statements in order to claim benefits from his employer. According to company policy, it was required that the employee see a doctor before he was entitled to short-term disability benefits. At the time of the discharge, all of the evidence available to the company indicated that the employee had misrepresented his claim. Thus the discharge was for a proper, though later proved erroneous, reason, and no illicit motive can be attributed to the company on grounds that the discharge was "unfounded."

Finally, we hold that, under the facts of this case, the sole union activity of signing a card and attending one union meeting is too attenuated from a discharge six months later. In view of the time lapse, we cannot say that an inference of connection can be drawn between the two that supports a finding of anti-union motive for the discharge. *See, e.g., Viracon, Inc. v. NLRB*, 736 F.2d 1188, 1192 (7th Cir.1984); *compare Hambre Hombre Enterprises, Inc. v. NLRB*, 581 F.2d 204, 207 (9th Cir.1978).

V

Thus, for the reasons we have given above, we conclude that substantial evidence in the record as a whole does not support the Board's conclusion that Brookshire discharged Homer Evans on account of his union sentiments in violation of section 8(a)(1) and (3) of the National Labor Relations Act. Consequently, we will not enforce the Board's order.

ENFORCEMENT DENIED.