**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 24, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-60635
_____

BROWN & ROOT, INC.,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

_____

Petition for Review and to Set Aside an Order
of the National Labor Relations Board
and Cross Application for Enforcement

_____

Before JOLLY, DUHÉ, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this appeal we are concerned with whether Brown & Root, Inc. ("Brown & Root") became liable under the National Labor Relations Act, as a successor employer, to the former employees of Brown-Eagle Contractors ("Brown-Eagle") at Ciba Specialty Chemical Corporation's facility in McIntosh, Alabama ("Ciba"). After it bested Brown-Eagle for the contract, Brown & Root met with the Brown-Eagle employees and announced that, upon application, they would be considered for employment with other applicants. As one might expect, this news was not well received by the Brown-Eagle employees. They became upset and began to ask about the future of

their union.  Brown & Root, which already had some 200 employees in another operation at the facility, stated in unambiguous terms that it was non-union and would remain non-union.  When Brown & Root completed its application and hiring process, about twenty-five percent of the Brown-Eagle employees who had applied had been hired.  The National Labor Relations Board was not favorably impressed.  The Board found that Brown & Root had coerced Brown-Eagle employees when it stated its position vis a vis the union; discriminated against all former Brown-Eagle employees whom it failed to hire; refused to recognize and bargain with the union; and unilaterally set initial terms and conditions of employment. The Board entered what can be fairly characterized as a sweeping order.  It ordered Brown & Root to: reinstate with back pay some 48 former Brown-Eagle employees;[1] recognize and bargain with the union without an election; and adopt retroactively the terms and conditions that had been in place under Brown-Eagle until new terms and conditions were negotiated or a bargaining impasse was reached.

In sum, after reviewing the entire record, the decisions of the Board and the ALJ, and the briefs of the parties, we hold that

---

[1]There has been some confusion as to the exact number of employee applicants at issue in this case.  What is clear is that 'at least' 66 of Brown-Eagle's 68 employees submitted applications to Brown & Root. 334 NLRB No. 83, *2.  The number 48 is arrived at by reference to the Board's decision adopting the remedial order of the ALJ, which listed the 48 employees it found Brown & Root had refused to hire. The 17 hired, plus the 48, yield a total of 65.  Apparently, one or more of the approximately 66 applications filed by Brown-Eagle employees with Brown & Root was never completed and some Brown-Eagle employee applicants were unreachable by Brown & Root; this accounts for the discrepancy in the totals.

the employer speech at issue with regard to its non-union position -- the only basis for a finding of an independent violation of Section 8(a)(1) against Brown & Root -- is protected under Section 8(c) of the Act and consequently did not constitute coercive speech in violation of Section 8(a)(1).

Without this alleged Section 8(a)(1) violation as a predicate upon which the Board's finding of motive was largely built, substantial evidence does not support the remainder of the Board's findings that Brown & Root violated Sections 8(a)(3) and (5) of the Act. We therefore conclude that the Board erred in finding that Brown & Root had unlawfully denied employment to any Brown-Eagle employees, and consequently, in ordering reinstatement with back pay for all 48 former Brown-Eagle employees who were not hired by Brown & Root. It follows that the Board erred in finding that Brown & Root had successorship obligations to the union and, consequently, in ordering Brown & Root to recognize and bargain with the Union and to restore retroactively the terms of employment that existed when Brown & Root assumed the packaging and materials handling operations. We therefore deny enforcement of the Board's order.

I

In 1998, Brown & Root was awarded a subcontract for packaging and materials handling work at Ciba. This work had previously been

3

done by Brown-Eagle.[2]  At the time Brown-Eagle lost its contract with Ciba, its 68 rank and file employees were represented by the United Food and Commercial Workers Union, Local 1657, AFL-CIO ("the Union").  Brown & Root, however, was no new-comer at the McIntosh facility; it had performed construction and maintenance services for Ciba continuously since the plant had been constructed in 1953. It employed over 200 workers.  They had never been represented by a union.

Under the newly awarded contract with Ciba, Brown & Root was scheduled to assume the packaging and material handling operations on June 10, 1998.  On May 26 and 27, Brown & Root's project manager Bill Outlaw and project superintendent Gordon Sloat held three shift meetings with Brown-Eagle employees.  Outlaw told them that their employment with Brown-Eagle would be terminated, but that they could apply with Brown & Root.  At two of these meetings, the atmosphere became heated after Bill Outlaw's answers to a variety of employment-related questions, all raised from the floor by the employees.  Some questions related to the future of the Union. Although the record is not uniform concerning the precise responses given by Outlaw to questions about the continuation of union representation, there is no question but that Outlaw indicated that

---

[2]Despite the similarities in their names, Brown & Root is unrelated to Brown-Eagle.  Brown & Root is now Kellogg, Brown & Root, Inc.

Brown & Root was non-union and would remain that way. The employees were neither happy nor content with what they heard.

Nevertheless, beginning May 29, 66 of some 68 Brown-Eagle employees applied for jobs with Brown & Root. However, consistent with its position that it was a new employer, and with its obligations to the U.S. Office of Federal Contract Compliance Programs, on May 28 Brown & Root posted an ad for applicants in a local newspaper. Brown & Root accepted applications from walk-in applicants, referrals from the state job service, and from current and former Brown & Root employees. Brown & Root accepted some 367 applications, including those from former Brown-Eagle employees.

Brown & Root's written hiring policy established a system of preferential consideration among the applicants: first, current Brown & Root employees, second, former employees, third, applicants referred by a Brown & Root employee or supervisor, and fourth, others. This policy was not a guarantee of employment and does not appear to have been uniformly followed.

Between May 29 and June 10, Brown & Root processed the 367 applications. Applicants were given a written test in arithmetic, followed by a "structured" interview consisting of questions and answers, and finally an interview with either Outlaw or Sloat. In order to progress to the structured interview, most applicants had to achieve a passing score on the written test. However, Brown-Eagle applicants progressed to the structured interview regardless

5

of test score, in apparent recognition of the skills they likely possessed as Brown-Eagle employees performing similar duties.

By June 10, after processing all applications, Brown & Root had hired 77 unit employees, of which 17 were former Brown-Eagle employees. Of the 14 unit supervisors Brown & Root hired, 11 were formerly employed by Brown-Eagle.

## II

On charges filed by the Union, the Board's General Counsel issued a complaint alleging that Brown & Root had violated Sections 8(a)(1), (3), and (5) of the Act; that is, the Complaint alleged that Brown & Root threatened employees, refused to hire employees formerly employed by Brown-Eagle, and failed to recognize and bargain with the Union. The Complaint further alleged that Brown & Root violated the Act by unilaterally changing the terms and conditions of employment. After a hearing, the Administrative Law Judge ("ALJ") dismissed the allegations of the Complaint with respect to three of the alleged discriminatees. He further found that Brown & Root had not violated the Act by establishing initial terms of employment. However, the ALJ concluded that Brown & Root had violated the Act by refusing to hire 48 former Brown-Eagle employees, and by refusing to recognize and bargain with the Union.

The Board was not altogether satisfied with the ALJ's decision. Although the Board adopted the ALJ's findings, it clarified his opinion, to make explicit the additional finding of

a distinct Section 8(a)(1) violation for the statements made by Outlaw at the employee meeting.  Furthermore, the Board reversed the ALJ's finding that Brown & Root was free to set its initial terms and conditions of employment; instead, relying on its finding that Brown & Root had attempted to avoid its successorship obligations by refusing to hire, it found that Brown & Root had illegally refused to bargain and imposed its own terms and conditions of employment.

In its remedial order, the Board was not shy.  It ordered Brown & Root to hire all 48 former Brown-Eagle employees with back pay, to recognize the Union, without an election, as exclusive bargaining representative for the packaging and material handling employees, and to adopt retroactively the terms and conditions of employment that existed at the time of the transfer of operations.  Brown & Root filed this petition for review of the decision and order.  The National Labor Relations Board cross-applied for enforcement of its order.

### III

When the Court of Appeals reviews the Board's findings, it must determine whether, on the record as a whole, those findings are supported by substantial evidence.  29 U.S.C. § 160(e).  Substantial evidence is "such relevant evidence as a reasonable mind would accept to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).  Because the Court is not left

7

merely to accept the Board's conclusions, the Court must be able to "conscientiously conclude that the evidence supporting the Board's determination is substantial." NLRB v. Mini-Togs, Inc., 980 F.2d 1027, 1032 (5th Cir. 1993); see also NLRB v. Brookshire Grocery Co., 837 F.2d 1336, 1340 (5th Cir. 1988). This court reviews the Board's conclusions of law *de novo*, but must enforce orders if the construction is reasonably defensible. NLRB v. Morotola, Inc., 991 F.2d 278, 282 (5th Cir. 1993). Accordingly, we must determine whether substantial evidence on the record as a whole supports the Board's findings that Brown & Root violated Sections 8(a)(1), (3), and (5) of the Act.

## IV

The Board contends that the statements that Outlaw made at the employee meeting violated Section 8(a)(1). It relies on this finding as a predicate for further violations of the Act for refusal to hire and refusal to recognize and bargain with the union in the sense that it is the only direct evidence alleged to establish anti-union motive for Brown & Root to violate the Act. Yet, Section 8(c) explicitly provides protection for employer speech. Because we find that the speech at issue in this case was protected, the 8(a)(1) violation cannot be sustained.

### Section 8(a)(1)

Section 8(c) of the Act explicitly provides that an employer has the right to express "any views, argument, or opinion" so long

8

as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Under Section 8(c) an employer is free to communicate to employees a statement of opinion about the union as well as predict the effect of unionization on the workplace so long as such a prediction is based on objectively verifiable facts and it does not contain a threat of reprisal or force. See Tellepsen Pipeline Services, Inc. v. NLRB, 320 F.3d 554 (5th Cir. 2003); Selkirk Metalbestos, N.A. v. NLRB, 116 F.3d 782, 788 (5th Cir. 1997). Section 8(c) "merely implements the First Amendment" rights already possessed by employers. Allentown Mack Sales and Service, Inc. v. NLRB, 522 U.S. 359, 386 (1998) (Rehnquist, C.J., concurring). "[A]n employer's free speech right to communicate his view to his employees is firmly established and cannot be infringed by a union or the Board." NLRB v. Gissel, 395 U.S. 575, 617 (1969). Section 8(c) thus affirmed the continued existence of employers' First Amendment rights, which must be balanced against the protection afforded by Section 8(a)(1) to employees' right to engage in union activity.

"Section 8(a)(1) prohibits employers from expressing anti-union views where the expression is accompanied by a threat of reprisal or force." Poly-America, Inc. v. NLRB, 260 F.3d 465, 484 (5th Cir. 2002); see also Gissel, 395 U.S. at 618. The test for determining "whether an employer has violated Section 8(a)(1) is whether the employer's questions, threats or statements tend to be

coercive, not whether the employees are in fact coerced ... The coercive tendencies of an employer's conduct must be assessed within the totality of the circumstances surrounding the occurrence at issue."  NLRB v. Pneu Electric, Inc., 309 F.3d 843, 850 (5th Cir. 2002) (citations and quotations omitted).[3]

An unlawful threat is established if the totality of the circumstances reveals an employee reasonably could conclude the employer is threatening economic reprisals if the employee supports the union.  Selkirk, 116 F.3d at 788.  The prohibitions of Section 8(a)(1) include statements that tell employees selection of a bargaining representative would be futile.  See, e.g.  In re Whirlpool Corp., 337 NLRB No. 117, *9 (July 5, 2002) (citing Trane Co., 137 NLRB 1506 (1962)).  However, this Court has only found comments to be unlawful statements about futility when accompanied by a threat or implication that the employer will take some action

_____

[3]The dissent's statement that the finding of a violation must be upheld if there is substantial evidence that the statements were specifically intended to discourage union involvement or threaten employees -- an inquiry into the employer's subjective intent -- mischaracterizes, we think, the standard for evaluating employer speech under § 8(a)(1).  Such an inquiry seems to be in conflict with the dissent's own admonition that the key determination is whether the statements *tend* to be coercive, a more objective inquiry based on the totality of the circumstances.

Furthermore, the dissent's statement that the relative sophistication of the Brown-Eagle employees or whether they nevertheless applied for jobs after Outlaw's comments is irrelevant is incorrect because unlawful threats are assessed under the totality of the circumstances.  The inquiry is whether "an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports the union."  Selkirk, 116 F.3d at 788.  Although it is true that the inquiry is not whether employees were *in fact* coerced, but rather whether the statements *tend* to be coercive, Pneu Electric, 309 F.3d at 850, the totality of the circumstances logically may include, objectively, consideration of the sophistication and past union experience of a particular type of audience and the likely response of such audience.

10

to render union support futile.  <u>NRLB v. Laredo Coca Cola Bottling Co.</u>, 613 F.2d 1338, 1341 (5th Cir. 1980) (statements that strike replacements were permanent constituted unlawful prediction of futility); <u>NLRB v. Varo</u>, 425 F.2d 293, 299 (5th Cir. 1970)(stated willingness of employer to shut down business indicated futility in violation of Section 8(a)(1)).

The precise content of Bill Outlaw's statements at the shift meetings on May 26 and 27 has been contested throughout this litigation.  The Board, in adopting the ALJ's decision, found that "[a]ccording to the credited testimony of employees . . . Outlaw responded that 'Brown & Root was a non-union company and was going to stay that way,' and that 'if the [Brown-Eagle] employees came to work for them they would be non-union.'"  <u>Brown & Root</u>, 334 NLRB No. 83, *2 (July 19, 2001).[4]

Although the Board and its ALJ are accorded deference when a factual finding rests on a resolution of witness credibility, <u>Blue Circle Cement Co., Inc. v. NLRB</u>, 41 F.3d 203, 206 (5th Cir. 1994) (citing <u>NLRB v. Motorola, Inc.</u>, 991 F.2d 278, 282 (5th Cir. 1993)), the issue here does not turn on credibility.  We accept the

---

[4]It is unclear fro m the decisions of the Board and the ALJ what they determined to be the exact content of Outlaw's statements.  Differing testimony was presented, and while the Board and ALJ credited the General Counsel's witnesses, each failed to make explicit precisely what they found Outlaw to have said at the meetings, using different quotes in different parts of their decisions.   In clarifying what it found to be Brown & Root's Section 8(a)(1) violation, the Board noted that the ALJ "found from the credited evidence that Outlaw announced to the Brown-Eagle employees, in specific response to their questions about retaining their union, that the Responded was a 'non-union company' and 'intended to stay that way.'"  <u>Id.</u> at *3.

11

credibility findings of the Board, but find that the Board's determination that Outlaw's statements violated Section 8(a)(1) is not supported by substantial evidence that the speech was unlawful. Therefore it cannot stand.

An examination of the circumstances surrounding Outlaw's statements demonstrates that employees could not reasonably conclude Brown & Root was threatening reprisals for their support of the union. Except for Outlaw's responses at the employee meetings, the Board does not contend that the record contains any evidence of threats, intimidation or coercion by Outlaw or any other Brown & Root representative. Nor does the record reveal any statements that any discriminatory action would be taken or that the union members of Brown-Eagle would be disfavored in the hiring process. Because there was no threat of reprisal or coercion, because these employees could not reasonably feel unlawfully threatened by Outlaw's remarks, and because Section 8(c) protects employers' right of free expression of opinion and fact, we hold that the statements did not violate Section 8(a)(1).

At the outset we note that the employee group was not naive, having its first experience with the union when Outlaw spoke to them; instead, the group had a lengthy experience working in a shop with a union contract. In the totality of the circumstances it cannot be assumed, objectively, that such a group would be quick to infer threats from otherwise permissible statements of position and

fact. Bill Outlaw addressed Brown-Eagle employees at shift meetings to, among other things, inform them about their job opportunities at Brown & Root and the application process. Outlaw was telling employees, whom he knew to be union members, that they had an opportunity to be employed on the same basis as other applicants. Outlaw, who was not trained in labor law, responded extemporaneously to questions from the floor by these union members about a variety of topics. The atmosphere at the meetings did become heated as the employees became dissatisfied with his responses to questions about vacation and insurance. Outlaw did not volunteer any unsolicited comments about the Union's future; he only responded to specific questions, stating Brown & Root's position, that "Brown & Root was a non-union company and was going to stay that way," and that "if the [Brown-Eagle] employees came to work for them they would be non-union." These statements were made in the context of a plant where Brown & Root already employed 200 non-union employees and if there were only one bargaining unit, 70 union employees would not change Brown & Root's non-union status. Furthermore, only if the doctrine of successorship applied - a doctrine that Outlaw was unacquainted with - would the employees initially "come to work" for Brown & Root as union employees. In sum, Outlaw's comments should be viewed as protected statements of Outlaw's opinion, Brown & Root's preferences, or objectively verifiable statements of the current state of affairs at Brown &

13

Root -- that it was non-union -- and of Brown & Root's wholly lawful intention and preference that its Ciba employees remain non-union. Illegal connotations cannot be attached to these lawful statements in the absence, as here, of any independent violations of labor law, and we believe the dissent is incorrect to say otherwise.

The record contains no evidence of any other comments or actions by Outlaw or any other Brown & Root employee that would lead the Brown-Eagle employees reasonably to feel coerced in the exercise of their Section 7 rights -- and the Board does not contend to the contrary.[5] Finally, the fact that 66 of 68 employees persisted in applying to Brown & Root despite these allegedly threatening statements supports a reasonable inference that no threat was conveyed to these employees and that they were not unlawfully intimidated by Bill Outlaw.

The authority cited by the Board does not otherwise convince us that these statements were unlawful. The Board relies principally on Galloway School Lines, Inc., 321 NLRB 1422 (1996) to support its assertion that an employer violates Section 8(a)(1) by telling employees it will remain non-union. Galloway involved a Section 8(a)(1) violation by a contract successor who informed its

---

[5]Discussing the threatening nature of Outlaw's statements, the dissent gives substantial weight, in concluding that the statements were unlawful, to the fact that Outlaw was in a managerial position and had final decision-making authority with respect to hiring; this fact, the dissent urges, imbues his comments with inherent coercion because they would be taken seriously. The unadorned fact of rank in managerial status, however, cannot transform otherwise lawful statements into threats.

14

predecessor's employee applicants that "his Company was not union, would never be union, that he would not hire union, and that he would do whatever he could to stay nonunion." Id. at 1422. Furthermore, when the employees in Galloway sought applications, the employer effectively informed them that the company would intentionally commit unfair labor practices by refusing to hire any union employees. Galloway is not this case. The employer statements in Galloway were not in response to employee questions at an unscripted meeting as here. Outlaw answered factually and responsively to spontaneous questions by Brown-Eagle employees. Further, Brown & Root never made any assertions to Brown-Eagle employees that reasonably could be interpreted to imply that it would commit an unfair labor practice to avoid a potential bargaining obligation. In fact, Outlaw told workers, whom he knew to be union, that they had an opportunity to be hired. The facts of Galloway make it inapposite to the case presently before us.

Furthermore, each of the cases cited by the ALJ, Pacific Custom Materials, Inc., 327 NLRB 75 (1998), Kessel Food Market, Inc., 287 NLRB 426 (1987), and Ryder Truck Rental, Inc., 318 NLRB 1092 (1995), to support his conclusion that Outlaw's comments were coercive, relies on facts that are fundamentally different from this case. In Pacific Custom Materials, the Board found a violation of Section 8(a)(1) in explicit statements by the successor's management to prospective employees that hiring would

15

be "a numbers thing" and that only a certain percentage of predecessor employees would be hired because the parent corporation was afraid they would vote the union back in. Id. at *1. In Kessel, the General Counsel presented testimony that management instructed supervisors "to stay under 50 percent of the [predecessor's] workforce" and that prospective employees were informed of a "quota" for union employees. Kessel, 287 NLRB at 427. Finally, in Ryder Truck, there was ample additional evidence of coercion where the employer admitted in testimony that, had potential transferees not resigned the union, they would not have been transferred to a new non-union facility. Ryder Truck, 318 NLRB at 1095. The violations found in these cases clearly were supported by substantial evidence of threats that explicitly informed employees the employer intended to commit unfair labor practices to avoid its bargaining obligation. The statements by Outlaw do not contain any threat, implied or explicit, and there is no evidence of other statements made by Brown & Root that would affect the meaning of its lawful statements; thus these cases are inapposite.

In our view, the facts of this case are more like P.S.Elliot, 300 NLRB 1161 (1990), which the Board attempted to distinguish. In P.S. Elliot, a successful bidder on a contract held a meeting with the displaced employer's workforce, at which the employees asked if the new jobs would be union. The company representative replied,

16

"we are a non-union company." The Board wrote that "Respondent did not violate . . . the Act by Elliott's statement to the former . . . employees that it was a 'non-union company.' Elliott's statement was in response to an employee question and was not accompanied by any threats, interrogations, or other unlawful coercion. Further, in light of Respondent's pre-existing operation as a nonunion company, Elliott's statement, constituted a truthful statement of objective fact." <u>Id.</u> at 1162. Although Outlaw's comments were more extensive than those in <u>P.S. Elliott</u> (largely because Outlaw's statement were in response to union members' questions), the facts and the statements bear a closer resemblance to <u>P.S. Elliott</u> than the cases relied upon by the Board; here, as in <u>P.S. Elliott</u>, the statements at issue are statements of position and objective fact. For the reasons stated above, none of the various statements credited by the ALJ and Board as having been said by Outlaw constitute unlawful coercion, but instead were permissible statements of opinion or objective statements of fact.

In sum, we conclude that Outlaw's statements were not coercive because they contained no threat, express or implied, of reprisal or futility. Moreover, Outlaw's statement to the union employees of Brown-Eagle was protected as free speech under Section 8(c) of the Act and consequently was not a violation of Section 8(a)(1).

Section 8(a)(3)

17

Once the Board's finding of illegality of Outlaw's statements is rejected, the finding that Brown & Root violated Section 8(a)(3) by refusing to hire 48 former Brown-Eagle employees is seriously undermined; we say this simply because its finding of this 8(a)(1) violation is a predicate upon which the Board built the illegal motive to taint Brown & Root's applicant choices for hire.  We begin our analysis of the Board's case - in the absence of an independent violation of 8(a)(1) - with the premise that successor employers are not under any obligation to hire predecessors' employees; at the same time, however, an employer who declines to hire employees simply because they are members of a union commits a § 8(a)(3) violation.  See NLRB v. Burns Int'l Sec. Serv., Inc., 406 U.S. 272, 280 (1972).  The proper test to be applied in refusal to hire cases is whether there is substantial evidence that an adverse employment decision was motivated by unlawful animus toward the union, not whether an employer's failure to hire employees was "solely" because of employees' affiliation with the union.  NLRB v. Houston Distribution Services, Inc., 573 F.2d 260, 263-64 (5th Cir. 1978).  Although this Court's review is "more than a mere rubber stamp," Asarco, Inc. v. NLRB, 86 F.3d 1401, 1406 (5th Cir. 1996), a reviewing court will uphold the Board's decision if it is reasonable and supported by substantial evidence on the record taken as a whole.  Valmont Indus., Inc. v. NLRB, 244 F.3d 454, 455

18

(5th Cir. 2001). We can reverse only if we find that the Board's decision is not supported by substantial evidence.

We once again review the relevant facts relating to hiring. Brown-Eagle had 68 rank-and-file employees at the Ciba facility at the time it lost the contract to Brown & Root. Of the 66 who applied for jobs with Brown & Root, 17, or slightly more than twenty-five percent, were hired. Out of a pool of 367 applicants, Brown & Root, applying its field hiring policy,[6] hired a total of 77 non-supervisory employees. Based on a presumed motive to discriminate, derived from the finding that Outlaw's comments violated Section 8(a)(1), further supported by certain inferences it drew from statistical evidence, and individual comparisons, the Board found that Brown & Root had unlawfully discriminated en mass against the 48 former Brown-Eagle employees who were not hired.

We cannot say this finding is supported by substantial evidence. As we have indicated, it is crucial to the Board's 8(a)(3) findings that Outlaw's remarks to the Brown-Eagle employees violated Section 8(a)(1). From Outlaw's response to employee questions, the Board drew a general inference of illegal union animus and a presumption that because Brown & Root stated that it

---

[6]The Board does not challenge that Brown & Root had an established hiring policy that set out preferences to be applied in the context of other job qualifications. The Board does, however, rely heavily for its case on the fact that it was applied non-uniformly and seems not to have influenced several of the hiring decisions. But the question is not whether Brown & Root applied its hiring policy uniformly, but whether it applied it in non-uniformly in a discriminatory manner against Brown-Eagle employees because of their union affiliation.

intended to remain non-union, it had a motive to illegally discriminate. Although the record contains no evidence that Brown & Root would not give union members fair consideration for employment and no evidence that it considered any applicant's union affiliation in any of the 77 hiring decisions, the ALJ reasoned that "the evidence did show that Respondent was motivated to insure that a majority of its unit employees did not come from the unionized Brown-Eagle work force." Brown & Root, 334 NLRB No. 83, *13 n.21. Although the statements of Outlaw indisputably allow an inference that Brown & Root had a strong preference to remain non-union, that preference was lawful. It seems too much of a stretch to conclude, as the dissent does, that the Board may draw an inference, based on Brown & Root's lawful preference, that it would violate the law simply because it had a preference, even a strong preference.[7]

---

[7]Under recent Board decisions, non-coercive statements protected by 8(c) may be used as evidence of an unfair labor practice in limited circumstances. See Sunrise Health Care Corp., 334 NLRB No. 111, *2 (Aug. 2, 2001); John W. Hancock, Jr., Inc., 337 NLRB No. 183, n.8 (Aug. 1, 2002) (citing Overnite Transportation, 335 NLRB No. 33, *4, n.15 (2001) and Affiliated Foods, Inc., 328 NLRB 1107 (1999)). The admissibility of such protected speech is currently contested by members of the NLRB. In Hancock, the Board noted members' willingness to overturn Board precedent in the light of language of Section 8(c), that "the expressing of any views, argument, or opinion, . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."). Certain members feel that the admission of such protected speech directly contravenes the plain language of Section 8(c). See Overnite Transportation, supra at *10, n.5 (Hurtgen, Chairman, dissenting). Some Courts of Appeals have agreed. See e.g., Medeco Security Locks, Inc. v. NLRB, 142 F.3d 733, 744 (4th Cir. 1998) (rejecting use of protected employer statements as evidence of union animus to support violation of Act); BE & K Constr. Co. v. NLRB, 133 F.3d 1372, 1375-76 (11th Cir. 1997).

With respect to this issue, we find the view of the minority of the Board to be more

20

Of course, the finding of a Section 8(a)(3) violation may be supported through circumstantial, rather than direct evidence, <u>NLRB v. Esco Elevators, Inc.</u>, 736 F.2d 295 (5th Cir. 1984). That evidence, however, must be *substantial*, not speculative, nor derived from inferences upon inferences. <u>Mini-Togs</u>, 980 F.2d at 1032 (emphasis added). The Board, relying on a variety of circumstantial evidence, concluded that although Brown & Root hired 17 former Brown-Eagle employees, Brown & Root refused to hire the remaining 48 former Brown-Eagle employees because of their union sympathies. We will review this circumstantial evidence to determine whether the Board's finding is supported by substantial evidence.

(A)

In this respect the Board's decision singled out ten of the 48 to demonstrate discrimination against all of Brown-Eagle's former employees. It found evidence to support a violation of 8(a)(3) in the fact that these ten former Brown-Eagle employees who were entitled to a hiring preference had not been hired when Brown & Root had hired 18 non-Brown-Eagle applicants who had no preference. This departure from its established policy was interpreted as evidence that Brown & Root failed to hire these applicants because

persuasive, particularly in this case. A lawful statement of a lawful position does not in itself allow inference that one is willing to enforce that position through illegal means. Accordingly, we reject any reliance on Outlaw's statements as evidence of illegal union animus. To hold otherwise, any successor employer in Brown & Root's position would be virtually prohibited from freely stating its position to employees, even though that position is protected by Section 8(c).

21

of their union activity, and this, in turn, was evidence to support a finding of massive discrimination against all 48. The Board specifically noted that "18 of the non Brown-Eagle applicants who were hired had no packaging and material handling experience and were not entitled to any preference under [Brown & Root's] written hiring policy. By contrast, ten Brown-Eagle applicants [who were not hired] not only had applicable experience but were entitled to preference under that policy." Brown & Root, 334 NLRB No. 83, at *3.

In drawing its conclusion of illegal discrimination against these ten from these facts and using it as evidence of discrimination against all 48, the Board stopped short of a thorough analysis of Brown & Root's application of its policy. An evaluation of the record as a whole seems to demonstrate that Brown & Root's hiring policy was not applied unevenly against Brown-Eagle applicants. Out of a total of 367 applicants, 144 possessed at least one of the three preferences. Of the 20 Brown-Eagle employee applicants who possessed at least one preference under the hiring policy, 10 were not hired (50%). Of the non-Brown-Eagle applicants with a preference, 82 were not hired, a rejection rate of 66%.[8] Thus, although it is true that the statistics indicate that Brown

---

[8]Of the 223 applicants who had no preferences under the policy, Brown-Eagle applicants fared better than their non-Brown-Eagle counterparts; Brown-Eagle applicants without a preference were hired at a rate of roughly 15%, while non-Brown-Eagle employees without a preference were hired at a rate of 10%.

& Root did not apply its preference policy to assure employment to qualified applicants, and although there seems to be no uniformity in its application, there is no demonstrated pattern that the policy operated to discriminate against the Brown-Eagle applicants when compared to other applicants.

Without some evidence that tends to show that the failure to hire these ten was based on their union activity or sympathy -- and there is no such evidence -- there is not substantial evidence to support the Board's conclusion that Brown & Root's failure to hire the ten constitutes evidence of illegal discrimination against either them or the additional 38 Brown-Eagle employee applicants.[9]

(B)

As further circumstantial evidence that Brown & Root violated Section 8(a)(3) by failing to hire all Brown-Eagle employee-applicants, the Board placed some emphasis on what it considered Brown & Root's departure from its stated intention to "retain as many Brown-Eagle employees as possible." Brown & Root, 334 NLRB No. 83, at *1. The Board drew this conclusion from Brown & Root's proposal to Ciba which stated: "Brown & Root understands the benefits of using a large portion of the existing Material Handling

---

[9]The same can be said for the ALJ's reliance on the fact that Brown & Root hired two inexperienced applicants who had not worked for Brown-Eagle and failed its battery of tests, while it refused to hire four former Brown-Eagle employees that had failed the same tests. The ALJ relied on this as circumstantial evidence of an unlawful refusal to hire all 48. Other than the impermissible inference of anti-union animus from Outlaw's statements, the general counsel has not presented any evidence that Brown & Root actually discriminated against these particular employees, or the remaining Brown-Eagle employees, because of their union activities.

23

work force and their immediate supervisors to provide continuity of that service and it is our plan to do so."  The Board also relied on a follow-up letter which stated "Brown & Root plans to hire a significant number of the existing work force to assure a smooth changeover . . .."  Id.

The Board's apparent theory is that Brown & Root had an intention to retain as many Brown-Eagle workers as possible at the time it made its proposal (although it was fully aware of their union status), and then retreated from that plan and acquired an illegal anti-union animus when the employees expressed themselves at the May shift meetings.

It is clear, of course, that Brown & Root, having worked at the Ciba facility for the duration of Brown-Eagle's contract, knew at the time it made its proposal that Brown-Eagle's employees were represented by the union.  Furthermore, Brown & Root's proposal simply stated that it understood the benefits of hiring "a large portion" or a "significant number" of the Brown-Eagle staff.  The record indicates that Brown & Root hired more than 25% of the Brown-Eagle hourly employees who applied, which may or may not qualify as "a large portion;" it does seem more than "a small portion" and not an "insignificant number" of the employee pool. Brown & Root's statements made no commitments; they did declare the general intention that there would be continuity of operations and it recognized the value of trained employees to achieving that

24

goal.  It is particularly difficult to see how Brown & Root's commitment to hire employees known to be union demonstrates any anti-union animus, and the Board apparently does not contend so; the Board only suggests that Brown & Root's attitude hardened into an illegal anti-union animus against these employees as a result of the May meetings.  As far as we can tell from the record, such a contention is based on speculation.  Thus the statements relied upon by the Board do not add support to a finding of substantial evidence of illegal discrimination.[10]

V

In sum, the record taken as a whole does not demonstrate substantial evidence to support the Board's finding of blanket discrimination against the 48 former Brown-Eagle employees who were not hired by Brown & Root.  Accordingly, it follows that Brown &

---

[10]The dissent accepts the NLRB's theory and interprets the proposals' statements to establish Brown & Root's intention "to hire mostly Brown-Eagle applicants." (Emphasis added.)  We do not find support for the NLRB's theory, or the dissent's characterization of Brown & Root's intentions, in the record.  Nowhere did Brown & Root evince or state an intention to hire "mostly" Brown-Eagle applicants; the record establishes that Brown & Root, at best, planned to hire "a large portion" or a "significant number" of the Brown-Eagle staff.  This more limited hiring goal, coupled with Brown & Root's preexisting familiarity with the unionized status of the Brown-Eagle employees, renders the NLRB's theory -- and the dissent's -– of intervening pro-union activity as the determinant of Brown & Root's hiring decisions, substantially weakened.

Root never incurred an obligation to bargain with the union[11] and we deny enforcement of the Board's order in its entirety.

Petition for relief GRANTED.

Cross-petition for enforcement DENIED.

---

[11]One minor issue should be clarified. After concluding that Brown & Root avoided its successorship bargaining obligations through massive discrimination against all Brown-Eagle employees in violation of § 8(a)(3), the dissent cites Galloway for the proposition that "a section 8(a)(3) violation is sufficient to find that the new employer 'would have employed a sufficient number of predecessor employees to be a successor employer had it acted lawfully.'" (quoting Galloway, 321 NLRB 1422 at 1425). The dissent appears to unduly broaden the narrow holding of Galloway by omitting the preceding language in the opinion, which clarified that "the 8(a)(3) violation in this case warrants" such a finding, due to the number of employees and the appropriate bargaining unit at issue in that case (emphasis added). We note this merely to avoid any confusion about what sorts of § 8(a)(3) violations trigger § 8(a)(5) liability.

DENNIS, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision granting Brown & Root's petition for relief and denying the NLRB's cross-petition for enforcement. We must enforce an NLRB decision if it is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). Therefore, if there is "such relevant evidence as a reasonable mind would accept to support a conclusion," we must defer to the NLRB, even if we would have decided the case differently. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Considering this deference, I would deny Brown & Root's petition for relief and enforce the NLRB order in its entirety.

The NLRB found that Brown & Root violated NLRA sections 8(a)(1), 8(a)(3), and 8(a)(5) when it took over the packaging and material handling department from Brown-Eagle. It relied on the following evidence, which showed that: (1) Brown & Root expressly stated that it intended to hire a "large portion" and "significant number" of the Brown-Eagle workforce to assure a smooth transition; (2) Outlaw was the highest ranking Brown & Root official at Ciba and made the final hiring decisions when Brown & Root took over the packaging and material handling department; (3) at a meeting to discuss the takeover, Outlaw responded to questions about the future of the current union by stating that "Brown & Root was a

27

non-union company and was going to stay that way" and that "if the [Brown-Eagle] employees came to work for them they would be non-union"; (4) after the meeting, the Union attempted to deliver demands for recognition and signed membership cards to Outlaw, who refused to accept them; (5) Brown & Root hired 78% of the Brown-Eagle supervisors that applied; (6) although the Brown-Eagle supervisors were hired before the general application process began, Brown & Root failed to solicit their advice regarding the Brown-Eagle applicants; (7) the field hiring policy granted preferences to applicants who were former Brown & Root employees or referred by current Brown & Root employees, but not to former Brown-Eagle employees who had worked in the packaging and material handling department; (8) Brown-Eagle applicants, however, were not required to pass a written test before proceeding to the structured interview because "they were already on the project performing the work"; (9) during the structured interview, applicants were not asked about any specific job skills or their recent job performance; (10) despite its initial intentions to hire Brown-Eagle employees to ensure a smooth transition, Brown & Root hired only 25% of the Brown-Eagle employees who applied; and (11) ten former Brown-Eagle employees with preferences in the Brown & Root hiring policy were not hired, although eighteen non-Brown-Eagle employees with no preference were hired. Because this evidence is

sufficient to support the NLRB's findings, its order against Brown & Root should be enforced.

## I. Section 8(a)(1) Violation

The section 8(a)(1) violation must be upheld if, considering the totality of the circumstances, there is substantial evidence showing that Outlaw made statements that specifically intended to impede or discourage union involvement and threatened reprisals if the employees supported the union. *Selkirk Metalbestos, N.A. v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997); *In re Whirlpool Corp.*, 337 NLRB No. 117, *9 (July 5, 2002). This includes statements by an employer that it would be futile to select a bargaining agent. *In re Whirlpool Corp.*, 337 NLRB No. 117, at *9. The key determination is whether the statements tend to be coercive, not whether the employees have in fact been coerced. *NLRB v. Pneu Electric, Inc.*, 309 F.3d 843, 850 (5th Cir. 2002). Therefore, the relative sophistication of the Brown-Eagle employees or whether they still applied for positions after Outlaw's comments is irrelevant.

This violation is supported by substantial evidence. Outlaw was a person of authority and an official representative of Brown & Root. He also made the final decisions as to which, if any, Brown-Eagle applicants would be hired. He stated at a meeting designed to address the Brown-Eagle employees' questions about the transition that "Brown & Root was a non-union company and was going to stay that way" and that "if the [Brown-Eagle] employees came to

29

work for them they would be non-union." Obviously, the responses by a person in Outlaw's position at an official meeting designed to answer such questions would be taken seriously and could, therefore, be considered coercive. It is also clear that these statements were specifically intended to discourage union involvement because Outlaw followed through on these promises and hired only about 25% of the Brown-Eagle applicants. Therefore, the NLRB could have found that Outlaw's statements violated section 8(a)(1) because these statements would tend to coerce an employee that it would be futile to belong to a union at Brown & Root.

Additionally, the NLRB was not required to find that the statements were protected by section 8(c). An employer's statement will be protected by section 8(c) if his comments are true statements of objective fact or do not constitute a threat of reprisal. 29 U.S.C. § 158(c); *In re P.S. Elliot Serv.*, 300 NLRB 1161 (1990). But here, Outlaw's statements were not true statements of objective fact. Although he did correctly state that Brown & Root was a non-union company, Brown & Root could not through lawful means guarantee that the packaging and material handling department would become non-union when it took over. Nor could Brown & Root truthfully maintain that the doctrine of successorship would not prevent its efforts to require a non-union shop with all non-union employees. His comments could also be reasonably construed as a threat. By stating that Brown & Root

30

intended to stay non-union, he reasonably could be understood to imply that it would do what is necessary to stay non-union. Therefore, the record supports the Board's finding that Outlaw made an implied threat that Brown & Root would not hire Brown-Eagle employees if hiring these employees would result in the unionization of the department. Accordingly, because Outlaw's statements were not protected by section 8(c), the section 8(a)(1) violation should be upheld.

## II. Section 8(a)(3) Violation

I would also enforce the section 8(a)(3) violation. To establish this violation, the NLRB must find that anti-union animus motivated an employer to make an adverse employment decision. *See* 29 U.S.C. 158(a)(3); *NLRB v. Houston Distrib. Servs.*, 573 F.2d 260, 263-64 (5th Cir. 1978). Under the burden-shifting analysis of *Wright Line*, the NLRB is first required to show that a motivating factor in an adverse employment decision was anti-union animus. *See Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 464-65 (5th Cir. 2001). If it does, then the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action regardless of its anti-union stance. *See id.*

Here, there is substantial evidence to show that anti-union animus was a motivating factor in Brown & Root's decision not to hire a majority of the Brown-Eagle applicants. In addition, Brown & Root has not proven that it would have hired the same number of

31

Brown-Eagle applicants even if it had not been trying to avoid unionizing the packaging and material handling department. Therefore, the section 8(a)(3) violation should be upheld.

As the majority explains, under the NLRB's version of events, Brown & Root planned to hire mostly Brown-Eagle applicants in order to ensure continuity when it took over the department. But, as the NLRB reasonably found, when it realized that these Brown-Eagle applicants were adamant about remaining unionized, it decided to avoid any union concerns caused by the successorship doctrine and hired only a minimal amount of Brown-Eagle applicants. Because the NLRB could reasonably determine that Brown & Root's decision not to hire Brown-Eagle applicants was motivated by its desire to remain non-union, Brown & Root's violation of section 8(a)(3) is supported by substantial evidence.

The majority does not contend that this version of events is incapable of supporting a section 8(a)(3) violation. Instead it concludes that the NLRB's account was not supported by substantial evidence and thus was mere speculation. I disagree. There is substantial evidence to support every aspect of the NLRB's theory. Therefore, I believe the NLRB proved that a motivating factor behind Brown & Root's hiring decisions was anti-union animus.

First, Brown & Root expressly stated that it planned to provide continuity of service by "using a large portion of the existing Material Handling work force" and "to hire a significant

number of the existing work force to assure a smooth changeover." Brown & Root argues that this meant it only intended to hire about a quarter of the Brown-Eagle applicants. But the NLRB could still have concluded that this 25% figure was not "large" or "significant," and that by its own statements Brown & Root originally intended to hire more Brown-Eagle applicants than it actually did.

Second, between the time Brown & Root made these statements and the hiring process began, the Brown-Eagle applicants made it abundantly clear that they would insist on remaining unionized. At the meeting with Outlaw, they asked numerous questions about unionization. Shortly thereafter, the Union delivered letters to both Brown & Root headquarters and Outlaw demanding to be recognized. Even if Brown & Root knew that the department was unionized before the meetings, it did not necessarily know the extent of the Brown-Eagle employees' fervor for remaining union employees. Therefore, this evidence supports the NLRB's finding that Brown & Root re-evaluated its hiring policies and decided to avoid hiring a majority of Brown-Eagle applicants after these events occurred.

Third, although it did hire some Brown-Eagle applicants, there is substantial evidence showing that Brown & Root's hiring process as a whole was based more on remaining non-union then on hiring the best possible applicants. Brown & Root hired only 25% of the

Brown-Eagle employees, but hired 78% of its supervisors, who have no effect on the successorship doctrine. Then it chose not to ask these supervisors about the qualifications of the Brown-Eagle employees, even though they would have provided valuable knowledge about these employees' abilities.[12] Brown & Root then proceeded to hire a number of non-Brown-Eagle applicants without a preference under the field hiring policy while rejecting a number of Brown-Eagle employees who had a preference. In addition, no applicant was asked about any specific job skills or recent job performance during the structured interview. Based on this evidence, it was more than reasonable for the NLRB to conclude that Brown & Root was more concerned about avoiding the doctrine of successorship than in hiring the best applicants.

If there were still doubt about Brown & Root's motivations, it is alleviated by Outlaw's statements at the Brown-Eagle employee meeting. These statements clearly show that Brown & Root was concerned about the future union status of the department and explains the primary motivation behind Brown & Root's actions during the hiring process - to avoid unionization. Therefore, the NLRB has adequately proven that anti-union animus was a motivating factor behind the NLRB's decision not to hire most of the Brown-Eagle applicants.

---

[12] This choice was doubly significant because those supervisors could have recommended some of the Brown-Eagle applicants, which would have given those applicants a preference under the hiring policy.

After the NLRB made its case, the burden shifted to Brown & Root to prove that it would have made the same hiring decisions even if it had no anti-union animus. It has not done so here. As noted by the majority, Brown & Root claims that it hired Brown-Eagle applicants with a preference under the hiring policy at a somewhat higher rate than non-Brown-Eagle applicants with a preference. It also hired Brown-Eagle applicants without a preference at a higher rate than similarly situated non-Brown-Eagle applicants. Although true, these statistics do not take into account the fact that Brown-Eagle applicants should have been hired at a significantly higher rate because of their experience. As noted above, preferences were not given based on previous experience with this type of work, but were instead based on being a former Brown & Root employee or being referred by a current Brown & Root employee. Thus the numbers that result from comparing applicants with or without preferences does not take into account that, as a whole, the Brown-Eagle applicants were vastly more experienced then their counterparts.

Initially, Brown & Root had admired this experience. It acknowledged the importance of the Brown-Eagle employees' experience when it stated that it wanted to hire a significant number of these applicants to ensure continuity and when it did not require them to pass the written test before moving on to the structured interview. But it never provided an adequate

35

explanation why this experience was suddenly irrelevant after the Brown-Eagle employees displayed pro-union sentiments or why it rejected so many of these experienced Brown-Eagle employees who applied for positions. Because Brown & Root failed to provide such an explanation, the NLRB was not required to find that Brown & Root would have made the same hiring decisions absent its anti-union animus. Consequently, the section 8(a)(3) violation should be upheld.

### III.  Section 8(a)(5) Violation

Finally, because Brown & Root had a duty to bargain with the Union as a successor employer, it violated section 8(a)(5) by refusing to bargain with the Union. Under the doctrine of successorship, a new employer who takes over a unionized unit has an obligation to bargain with the union if: (1) that new employer is in fact a successor of the old employer and (2) the majority of its employees were employed by its predecessor. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987). Whether an employer is in fact a successor "is primarily factual in nature and is based upon the totality of the circumstances." *Id*. at 43. It focuses on whether "the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations," keeping in mind whether "those employees who have been retained will understandably view their job situations as essentially unaltered."

36

*Id.* A new employer will be considered the successor employer of its predecessor if there is "substantial continuity" between the two operations. *Id.*

Brown & Root is a successor employer of Brown-Eagle. First, Brown & Root did not start a new operation, instead taking over Brown-Eagle's contract to run the already-existing packaging and material handling department for the same customer, Ciba. As a result, its employees' positions were essentially unaltered because they performed the same work under the same conditions for almost all of the same supervisors. Therefore, there was substantial continuity between the Brown & Root and Brown-Eagle operations. Second, but for its discriminatory hiring practices, as found by the NLRB based on substantial evidence, Brown-Eagle applicants would have constituted a majority of the Brown & Root workforce in this department, which would have satisfied the second prong of the successorship doctrine.

Because it cannot benefit from its unlawful practices, we must uphold the NLRB's finding that Brown & Root was a successor employer and had a duty to bargain with the Union. *In re Galloway*, 321 NLRB 1422, 1425 (1996) (holding that a section 8(a)(3) violation is sufficient to find that the new employer "would have employed a sufficient number of predecessor employees to be a successor employer had it acted lawfully"). In addition, because of its discriminatory acts, Brown & Root also lost the right to set

the initial terms and conditions before bargaining with the Union. *Id.* at 1427. Accordingly, by refusing to bargain with the Union, Brown & Root violated section 8(a)(5). Therefore, the NLRB was justified in requiring Brown & Root to abide by the previous bargaining agreement until a new agreement with the Union can be negotiated. *Id.*

## IV. Conclusion

In sum, we must defer to the NLRB as long as its findings are supported by substantial evidence. Because its findings are so supported in this case, I would deny Brown & Root's petition and enforce the NLRB order.